HENRY VAN VOORHIS v. FLORENCE M. VAN VOORHIS.

*Divorce—Evidence—Improper methods of procuring testimony.*

1. The principle of the maxim, *falsus in uno, falsus in omnibus*, may be extended to. the entire testimony offered in behalf of a litigant who is shown to have been guilty of corrupt practices in procuring the testimony, or any part of it.

2. A party coming into a court of equity, and asking to be released from the bonds of matrimony and its obligations, must come with clean hands, and must keep them clean, so far as relates to the procurement of testimony to make out his case.

Appeal from Kent. (Grove, J.) Submitted on briefs October 13, 1892. . Decided December 22, 1892.

Bill for divorce. Defendant appeals. Decree reversed, and one entered here for defendant. The facts are stated in the opinion.

*Ward & Ward,* for complainant.

*Thomas F. McGarry* and *William F. McKnight,* for defendant.

McGRATH, C. J. This is a bill for divorce. The parties were married May 6, 1890, at Carson City, Mich., and the bill for divorce was filed October 3, 1890. Complainant was about 60 years old at the time of the marriage, and owned some property in Grand Rapids, and a large farm at Bancroft, and was reported worth from $45,000 to $50,000. Defendant was 34 years of age; had been married before, and procured a divorce from her former husband; resided with her mother, who kept a boarding house at Carson City. Complainant had known her for a year before the marriage. Soon after the marriage the parties moved into Grand Rapids, and lived at 699 South Division

street, in rooms over a store in a building owned by complainant. Defendant's mother came with her to Grand Rapids, and lived with them.

The original bill charged extreme cruelty; alleged that one Frank Pulford boarded with defendant's mother at Carson City; that after the parties came to Grand Rapids, at the solicitation of defendant, Pulford followed them, visited at their house, and remained for a week or 10 days; that defendant urged complainant to allow Pulford to remain there, but that complainant objected; that thereupon Pulford engaged a room at 628 South Division street; that afterwards defendant made almost daily visits to Pulford at his room, and remained there from 20 minutes to an hour at a time; that Pulford was doing nothing at the time, and defendant was supporting him; that defendant frequently carried food to said Pulford; that Pulford frequently visited defendant at No. 699, remaining there for some time; that on one occasion, when complainant was out of the city for several days, Pulford visited No. 699, and remained all night; that one time defendant was sick, or claimed to be sick, and Pulford came over and sat in the room with her for about half a day; that these visits were clandestine, became notorious, and created scandal; that complainant remonstrated, but without avail; that defendant frequently left complainant alone in one room, and went into another with Pulford; that Pulford has entered the house by the back way, and visited defendant in the kitchen and dining room; that she has withdrawn herself from complainant's society for two weeks at a time, and has substantially left his bed; that she involved him in debt; that she now tells him that she cannot live with him, and is not happy, and that if she continues to live with him she will become crazy.

An answer to this bill was filed November 13, 1890, denying the aforesaid allegations, except that—

"Frank Pulford, named in said bill of complaint, was like one of the family in her mother's house; that said complainant had been there considerably, and knew it and was a friend of Frank Pulford; that he was like a younger brother to her, and she was 11 years the older; that, while he was 22, he was quite a boy, and was treated as such in the house; that herself, her husband, and her mother, with whom she lived, were all as common with Frank Pulford as though he were one of the family; that when she came to Grand Rapids she invited Pulford to visit them when they should get to housekeeping; that some time after they went to housekeeping Pulford did come to visit them; that he was ˙treated in the house by complainant, this defendant, and her mother exactly as before; that after he had been in the house a day or two there was talk in the house about his doing some work for complainant,—fixing up around,—and Pulford expressed himself as not wishing to visit there long, but wanted to go to work, and he did stay there a number of days, and worked for complainant about the premises, complainant working with him;    *    *    *    that said Pulford was apparently doing his best, as a country boy, to get something to do in the city, where he might earn his living, and she and her mother did their best to aid him, and she verily believes that said complainant also said and did all he could to help Pulford;    *    *    *    that Pulford rented a furnished room in the family of a Mr. Free, on the opposite side of the street, a short distance only from where complainant and this defendant lived; that the room he occupied was practically in open view of the family, the sitting room occupied by the family being adjoining it, and folding doors only between it and the room occupied by Pulford; that it is a fact that she used to run across there and talk with Pulford when he was there, but it was done openly, at all times of day, as she happened, —not daily, however,—and she became familiar there in the house, and ran over there and visited with Mrs. Free; but she says that her visits across there were open as day, in the presence of complainant and everybody else who saw fit to look; that she did so with no thought of wrong, and is sure that complainant never suggested to her, having full knowledge of the situation, that it was improper, or that in any way he made complaint.

"She denies that under pretext that said Pulford was sick at one time, and needed her care, she left said hus-

band at home alone, and went and remained at said Pul-
ford's room the greater part of one night, and that she
was with him in his room the next day, and the follow-
ing evening at his said room, as alleged in said bill of
complaint, but, on the contrary, this defendant shows that
there was no pretext about it; that said Pulford was sick,
and seriously so, and needed attention, at Mr. Free's; that
she went over there with her mother, and she and her
mother nursed and cared for him; that he had no other
friends here to do so for him, and was unable to care for
himself; that she did stay in his room,—with her mother,
usually,—and nursed him in his sickness, the greater part
of one night; that she was there the next day and the
next evening, and so was her mother, and went on errands
of kindness and care for their friend, and complainant was
there, and knew about it, and never thought to make an
objection, or find fault with it; that she and her mother
were but performing a duty that she thought then, and
thinks now, she ought to do; that said Pulford was very
sick, and the family in the house aided in caring for him,
and there was nothing connected with said sickness or
visits about which any person could complain;   *   *   *
that, as stated above, she ran over there freely, openly, in
the daylight, without a thought of wrong, and did not
stay or sit in the room many minutes in the whole time;
that the fact is that complainant never objected to it, to
her knowledge, or suggested a word of impropriety or
offense at it."

Referring to the allegation that, while complainant was
absent, at Bancroft, Pulford remained at the house over
night, she says—

"It is true that she invited him over there to stay
while he was away, and he did stay there; that this de-
fendant had lived but a short time in the city, coming
from Carson City; that her mother was there with her,
and she occupied the same bed with her mother; that
they both felt nervous, and desired that some man be in
the house, and went over and asked Pulford to come and
stay while Mr. Van Voorhis was gone, and he did so; but
she would never have thought of doing such a thing had
she supposed the complainant objected to it, and in fact
he did not object.   *   *   *   *   *   *   *   *   *
"That at one time a relative of Pulford was sick in

Detroit, and he wished to go, and needed $5 more money than he had; that this defendant told complainant of his condition, and complainant gave her $5 for the express purpose of loaning it to Pulford to use in going to Detroit; that she also lent said Pulford $5 early in August; that Pulford asked her for it for a day or two, saying he expected money the next day, and would return it, certain; and she says that he did return it to her the next day but one, and the loan injured no one; that this is all the money Pulford had of her, in any manner or at any time; * * * that, while said Pulford was sick, she and her mother carried over to him such things as were needful in a sick room,—a small amount of food suitable for a sick room,—and after he was up from his bed, not able to work, either she or her mother took over things to him that they thought would tempt his appetite, * *

* but that she did not persist, for complainant never suggested that he did not wish her to do it, but was there and saw it done as openly as his house was conducted in other ways. * * * * * * * * * * *

"In reference to that part of the complaint that on a certain occasion this defendant was sick, or claimed to be sick, and that Pulford came to their house and sat in defendant's bedroom, where she was, for about half a day, and that complainant has objected to such conduct repeatedly, she says the facts were that she was sick in bed, seriously; that the room in which she was was with open doors, and the two sitting rooms and her bedroom were like one common room; that Pulford did come there, and did come in to see her, and sat there,—not a half day, however, but was there considerably, probably an hour, and in there more than once, but her mother was there, and complainant himself was there, and the first time she ever heard that he had any objection to Pulford's coming in there was when she read it in the bill of complaint; that complainant never thought of being offended at it, and, if he did, he never told it to her. * * * *

"That in their house there are two sitting rooms; that there is a wide opening for a door between them, about six feet wide; that this door is draped a little at the sides, but not but what there is an opening of about six feet,— a third of the width of the room; and it quite likely has happened that she has sat in one or the other of those rooms while complainant was in the other part, but that her mother was always in either one of those two rooms, or

in the adjoining room, with the door open. * * * *

" That there is an outside stairway at the back of their rooms, that they all use more or less, and she has no doubt that Pulford has sometimes come up those stairs, as it was a common habit in the house to use them; but she says that there was no time while she lived in that house that her mother was not present when he or anybody else was there, and she and her mother did the housework.

" She says that it is true that she slept with her mother some of the time, but never without speaking to complainant and procuring his assent; and she denies that she, at the time of filing said bill, had left his bed, but alleges the contrary thereof to be true."

The indebtedness incurred by her is explained, and the amount thereof fixed at $80, which was expended for household furniture.

A replication was filed to this answer. April 3, 1891, complainant filed an amended bill, setting up 17 specific acts of adultery committed by defendant with said Pulford. An answer was filed April 15, denying each and every act charged. The hearing commenced May 18, 1891. Pending the hearing, and after complainant's proof was mostly taken, defendant became mentally deranged, and was adjudged insane May 22, 1891, and was sent to the asylum at Kalamazoo for treatment. She recovered, and was released in September, and the taking of testimony was resumed. At the close of the complainant's proofs, defendant gave notice of an application for leave to file a cross-bill, or an amended answer in the nature of a cross-bill, which was filed September 23, 1891.

The answer to the supplemental bill sets up that, in a conversation had with complainant immediately after the subpœna was served, complainant offered to pay defendant $1,000 if she would not oppose the divorce proceeding. In the answer filed, which was in the nature of a cross-bill, defendant alleges that—

" After filing the answer of this defendant to the

original bill of complaint, and after the said complainant
had become fully satisfied that he could not induce this
defendant to enter into a conclusive arrangement with him
concerning the matter of said divorce, the said complain-
ant entered into a scheme with certain creatures for the
purpose of obtaining evidence against her which would
justify this court in granting a decree of divorce to the
complainant; that it was the avowed purpose of the said
complainant, through, by, and with the assistance of the
aforesaid creatures, to endeavor to place this defendant in
some compromising position or relation, in order that
evidence of such fact might be introduced in this case,
tending to ruin her reputation in the eyes of the court,
and blast her reputation in the opinion of the world; that
after the consummation of said scheme the creatures employed
to carry it into effect commenced their operations, at the
request of, under instructions by, and in the expectation
of liberal pay from, the complainant, if successful in said
scheme; that various artifices and devices were resorted to
in order to compromise this defendant, but each of them
proved unsuccessful, and the efforts in that direction were
entirely abandoned; that failing to place this defendant in
any compromising position or relation, and thus obtain
evidence against her for use in this court, some of the
creatures hired by the said complainant, as aforesaid, con-
cocted, planned, devised, arranged, and agreed together to
swear falsely as to having seen this defendant in improper
places, and to having witnessed criminal conduct on her
part.

"That thereupon the grounds for divorce alleged in the
original bill were substantially abandoned, and the amended
and supplemental bill exhibited against this defendant,
setting forth with minuteness and particularity the disgust-
ing particulars mentioned therein, all of which this de-
fendant avers were wholly untrue, were known by
the complainant to be untrue, but were obtained for
the sole and only purpose of succeeding in this litigation,
and depriving defendant of her just rights; that it was
entered into, as this defendant is informed and believes,
and carried into execution, solely as a money-saving expe-
dient on the part of the complainant. *    *    *    *    *

"That when the case came on to be heard, and the
charges specified in the amended and supplemental bill
were attempted to be established by the testimony of the

creatures employed by the said complainant, as aforesaid, and knowing that she had lost her memorandum, and that meanwhile G. Chase Godwin, on whom she relied to conduct her defense, had died, and knowing that the testimony so given was absolutely false, this defendant became overwhelmed with disgrace and shame, broken down in health and spirits, and finally, as she has been informed and believes, became deprived of reason; that she was tenderly cared for by the friends with whom she chanced to be at the time, and the medical attendants who waited upon her; that she was adjudged insane by the probate court for the county of Kent, was removed to Kalamazoo, and confined in the insane asylum, where she remained about three months, and there received such treatment that her reason was again restored; and she returned to her mother, and went out in the country to Carson City, where she had formerly lived, and there remained until on or about the 19th day of the present month, when, in obedience to a letter from her present counsel, she came to the city to attend the trial.

"That on Tuesday morning, September 22, 1891, this defendant for the first time learned that one of the persons who had been employed by the said complainant to obtain evidence against her had made a statement exposing the entire scheme; that up to this time the defendant had no knowledge that any woman had been employed against her; although she suspected the existence of some nefarious plot, she did not believe it extended quite so far, and thought it was confined to men who were low enough to perjure themselves for the money they would receive for so doing.

"That the nature of the testimony that the complainant had procured by the means aforesaid, but not the means by which he had procured it, was frequently given out and repeated by the said complainant to the friends and neighbors of this defendant, while the public press of the city—but, so far as they were concerned, most unwittingly—joined in the work of injustice, so that from one end of the city to the other, and throughout every place where this defendant was acquainted, she was held up to public gaze and public execration as a despised adventuress and disreputable strumpet, and that, too, before she had been afforded an opportunity of saying a single word in her own defense.

"That by reason of the facts aforesaid this defendant

has been compelled to suffer the most poignant sensations of shame and sorrow; that the said complainant has been, in causing and procuring, lending, arranging, assisting, and carrying out the schemes hereinbefore set forth, guilty of extreme cruelty towards this defendant."

Five separate acts of adultery were sought to be proven. The first is alleged to have occurred some time in July, 1890, in one of the rooms occupied by complainant and defendant. This was a storeroom adjoining the hall, having a window looking out upon the back stairway. The time alleged was between 8 and 9 o'clock at night. The witness Davidson says that he and his wife were going up the back stairs; that the curtain was up about an inch from the lower sash; that there was a lamp burning brightly in the room; that he, looking under the curtain, saw the parties in the act; that he called his wife's attention, and they both stood on the stairway from three to five minutes and watched the parties; that the parties were dressed, and, after the act, took the lamp, and carried it into the next room with them. It appears from the cross-examination that the person with Davidson on that occasion was not his wife, but was his adopted daughter, Ida M. Watson, with whom Davidson was then living in open adultery; that Davidson was a married man, having grown-up daughters; that his wife afterwards obtained a divorce from him on the ground of adultery with this very woman, and after the divorce Davidson married this woman, who also swears to having seen the act.

The second act is alleged to have been committed on the 18th of October, 1890, and the third on the 5th of November, 1890, at the Albion House, at Muskegon. One F., who was the proprietor of the Albion House, swears that Pulford staid at his house and occupied the same room on each date. Pulford was then porter at the Occidental Hotel in Muskegon. The witness claimed to know Pulford. He had never seen defendant before. The evi-

dence was looked up by one Burch, who went to Muske-gon on St. Patrick's day, 1891, without any knowledge that defendant had ever been there. He claims to have asked F. if Pulford had ever stopped at his hotel, and was informed that he had. He then claims to have asked if he had a woman with him, and was told that he had. He then exhibited to F. a photograph of defendant, and asked if she was the woman, and was told that she was. F. came down to Grand Rapids afterwards, and identified the defendant as she came out of church on Sunday. This testimony was supplemented by that of one M., who knew defendant, and who came to Grand Rapids in the fall of 1890, on the day after election. M. says:

"I met the lady going to the train I got off from. I took her to be Mrs. VanVoorhis.

"*Q.* Did she take the train on that occasion?

"*A.* Why, I think she did.

"*Q.* What did she have with' her?

"*A.* If my memory serves me rightly, a satchel. I did not speak to her.

"*Q.* Did you know her well at that time, so as to be certain it was her?

"*A.* Why, I think I should know her. I might have been mistaken. Have known her for 30 years."

On cross-examination:

"*Q.* Where did you say you thought you met Mrs. Van Voorhis?

"*A.* I said I thought I met Mrs. Van Voorhis getting onto the train, on the platform. When I got off the train, and came towards the street car to take the street car, I just passed,—I thought Mrs. Van Voorhis passed me.

"*Q.* She passed you along on the sidewalk?

"*A.* Yes, by the depot.

"*Q.* You did not watch where she went to?

"*A.* No, sir.

"*Q.* Didn't see where she went to?

"*A.* She went towards the car.

"*Q.* Did you see her board that car?

"*A.* I did not.

"*Q.* And you are sure it was her?

"*A.* I think it was her.

"*Q.* Are you sure, now? Don't be 'thinking' about those things.

"*A.* I will say it was her.

"*Q.* How was she dressed?

"*A.* Well, now, I couldn't tell you.

"*Q.* How near dark was it?

"*A.* Somewhere between 3 and 4 o'clock. I cannot tell exactly what time that train got in, for I never paid any attention to it. Came down on the train, and I know the lights were lit up when I got over in the city."

Upon cross-examination F. is required to produce the hotel register, upon which the entries are made with a soft lead pencil, and by the proprietor, and not by the guests. That register is one of the common 26-line hotel registers, with columns for "Call," "Time," "Room," "Name," and "Residence." On the page on which it is alleged that "Frank Pulford & Wife" are first registered, there are 18 entries, 4 of which are different dates. But 4 or 5 of the other entries are intelligibly written. The "Residence" column is filled with all sorts of *memoranda.* In the "Name" column there are 5 entries, then 1 blank, then 4 entries and 2 blanks, then 1 date, then 2 blanks, then 8 entries, and then 3 blanks. On the page where it is alleged that "Pulford & Wife" are next registered, there are 14 entries and 12 blanks. Four of the entries in the "Name" column are different dates. One is "Meals, paid $1." One is "Beny. paid $5." Another is "Smith." Three or four only of the others are intelligibly written. In the "Residence" column there are all sorts of *memoranda*. On neither page is the residence of a guest given, except in a single instance, and that is of a guest from Grand Rapids, registered on the same date, November 5, upon which the entry of "Pulford & Wife" is alleged to have been made. The entry of "Pulford & Wife" is the first entry upon that date, and the letter "L" appears in the "Time" column. In the "Time" column of the

very next entry the letter "S" appears. Both of the entries of "Pulford & Wife" bear unmistakable evidence of rewriting, of erasure, and of rubbing. In both, other lines are present; and, examined with a glass, it is clear that another name was originally written in both spaces, or the names framed out of parts of another name.

The next acts charged are alleged to have been committed on February 26, 1891, and March 12, 1891. After the bill was filed, defendant and her mother continued to reside in the apartments where they had lived. Access to their rooms was had by stairs leading up from Division street. The hallway was narrow, and the foot of the stairs was about six feet from the street door. It was in this hallway, at the foot of the stairs, within a few feet of the sidewalk, at between 11 and 12 o'clock at night, that these two acts are laid. Burch and Woodworth claim to have witnessed the first, and Woodworth and Lane, the second. The observation was made from the head of the stairway in the hall, at a point about six or eight feet from the doorway leading into defendant's apartments. The building stood on the corner of Division street and Eleventh avenue. A back stairway led up from Eleventh avenue. Burch claims to have seen Pulford in Grand Rapids at 11 o'clock on the night of February 23, in company with defendant, on the street, but he did not shadow them. He claims to have seen Pulford again, on the afternoon of February 26, go up this back stairway, and, with a key, open the rear door of the apartments, and enter, but he did not see him go out again. At 8 o'clock that evening, according to Burch, he and Woodworth stationed themselves near the building, and watched from that time until 11:30 at night, when they saw defendant and Pulford get off from a street car, and go into the hallway from Division street. Burch and Woodworth then claim to have gone around to the rear entrance, up the

back stairway, and through the hall to the head of the front stairs, where they saw them in the act. Pulford had his overcoat on, and defendant had her cloak on. Both stood up on the hall floor. The front door was partly open, and there was a street light at the curb, opposite the door, shining in upon the parties.

On March 12, Burch, Woodworth, and Lane claim to have been on watch, and that they saw defendant and a man, whom they think was Pulford, go into this same hallway. Burch remained outside, and Lane and Woodworth went around the back way, up the back stairs, through the hallway, to the head of the front stairway, and there witnessed a repetition of the same act, in the same place, under the same precise conditions. Burch and Woodworth say that on the first occasion, and Woodworth and Lane say that on the last occasion, after the commissions of the act, defendant invited Pulford to her room; but Pulford declined to go, saying that he had an engagement down town. It will be observed that on both of these occasions defendant and Pulford had been out during the evening. It was at an inclement season of the year, and at the same time the act was committed the parties were within a few steps of the apartments occupied by the defendant. It will not do to say, in explanation, that her mother was in these apartments; for one act of adultery is already laid there, and the charges made in the bill, and the testimony offered by complainant, are for the most part irreconcilable with any other theory except that the daughter was being shielded in her adulterous intercourse by the mother.

Smith's Opera House was a variety theater. Lane and Woodworth testify that defendant and Pulford were at that theater on the evening of March 12. Defendant insists that she never was in Smith's Opera House. Pulford denies that he was there. It must be remembered that

the bill had been filed herein October 3. It did not expressly charge adultery, but between the lines it meant to convey the impression that adultery had been committed. Yet it is alleged that in the same month defendant left Grand Rapids, satchel in hand, and took the train for Muskegon, and there went to an hotel with Pulford, and remained all night; that she repeated the same thing on November 5; that on March 12 she went, in company with Pulford, to a disreputable theater, and sat in a box, exposed to the view of hundreds of persons; and no person is found to testify to the fact but Lane and Woodworth, who were in the employ of complainant.

Defendant and Pulford were both sworn, and expressly denied each and all of the acts of adultery charged. Defendant testified that she did not remain away all night from the apartments at 699 Division street during the time that she and her mother occupied them, and her mother corroborates her; that she was not at Muskegon on the dates named, and has never been in Muskegon. Pulford testifies that he left Grand Rapids and went to Muskegon on October 9, 1890, and remained there, and was not at Grand Rapids February 23, February 26, or March 12; that he was at Grand Rapids in December, and again on February 10; that he came in December at the suggestion of defendant's solicitor, and in February he came to see said solicitor; that he never stopped at the Albion House, in Muskegon, and had never been in the house.

A Mrs. Blair is sworn for defendant. She says that in March Burch, whom she had known, met her upon a street car in Grand Rapids, and asked if she was willing to do some detective work. He told her that she "would have a chance to make some money in the case; and I asked him how much, and he said undoubtedly it would be any price I asked." He (Burch) had told her that the woman in the case was a designing woman, and the man, an

abused man.    Mrs. Blair refused to enter upon the work
without her husband's consent.

"Next day he came to get my husband's consent, and
obtained it, and the next day he brought Mr. Van Voorhis,
and introduced him as the gentleman who was interested
in the case.    I was to get entrance into her house as a
friend, gain her confidence, take her out for a drive, and
get her into a drinking house or other disreputable place.
Pulford was to take part, if I could make his acquaintance.
I was to make my own plans.    Burch was to follow us.
I was to fix my own price.    I was to try and get her to
go to Smith's Opera House.    This was agreed between
myself, Burch, and Van Voorhis, and they were to furnish
the tickets.    I did get acquainted with her, took her for a
drive once, laid in wait for her again when she was out
shopping, and went with her.    On both occasions I invited
her to take a glass of beer, to go to Smith's Opera House,
and to visit disreputable places; but she refused, and I gave
it up.    I received $6 from Burch."

Mrs. Blair further testifies that Burch told her that he
had received $200 for his work.    Mr. Blair corroborates
his wife as to Burch's visit to his house, as to complain-
ant's visit, and to Burch's statement that he had received
$200 for his work.

One Thornton testifies that Burch approached him some
time in the spring of 1891, and asked him if he would
make one of a party of four—two ladies and two gentlemen
—to go out with a double carriage and have a little sport.
He said:    "Mrs. Van Voorhis and some other—I have
forgotten the name—wanted to go out, and he wanted to
know if I would be one of the party to go along and have
a good time."    Thornton was afterwards introduced to
Van Voorhis, either by Burch or by the party who had
introduced Burch to Thornton.

"It was understood in this way, if we went out for a
ride, he [Burch] was to go with another rig.    I saw the
parties two or three times after that.    It was carried
along.    A lot of talk went with it.    Did not amount to

anything.    It never came to a focus.    I guess they did not get together; some disappointment or something.''

One S. was called by complainant to testify as to relations between defendant and Pulford while at Carson City. Two witnesses testify that they were present with this witness, at work, when complainant called upon him, some time before the hearing, and that complainant told S. that he wanted him as a witness in a divorce case.    He first asked him if he knew anything against the lady's character, and S. told him that he did not. ' Complainant had some lengthy conversation with S., in the course of which complainant used this language: "If you will come to Grand Rapids, and swear so and so, I will make it well worth your while.    I will pay you well for it."

Defendant takes the witness-stand, and submits herself to a rigid cross-examination.    Pulford does likewise. Defendant's mother is a witness, and her testimony covers the entire period.    Mr. and Mrs. Free are called by defendant, and neither discloses any improper conduct or attempt at secrecy on the part of defendant.

Upon this record, Burch and Woodworth and Lane were evidently in the employ of complainant.    Burch equivocates, evades, and vacillates with reference to his employment.    He says he was employed on certain nights, and on others he was not.    He guesses he received $10 or $12 for his services, although he says that he was on duty dozens of nights, and went to Muskegon for complainant, and the testimony shows that he was engaged otherwise in obtaining testimony.    He at first intimates that his meetings with Woodworth and Lane were purely accidental. He does not know at first how he came to meet them, or where he met them.    He it is that worked up the Muskegon testimony, planned the hall investigation, engaged Mrs. Blair to lead defendant astray and manufacture testimony, and evidently Thornton was to act as one of the

parties in this scheme.    This was after Burch and Wood-
worth had already discovered, according to their testimony,
Pulford and defendant in the very act; after complainant
had been informed, according to Burch, of what had been
discovered on February 26, for he says he told complain-
ant on the next morning after that date; undoubtedly,
after Lane and Woodworth claim to have discovered Pul-
ford and defendant in the act on the night of March 12;
after they had told complainant of this discovery, for he
was informed on the very next morning, and "laughed
about it;" undoubtedly, after Davidson and his paramour
had informed complainant of the discovery claimed to have
been made in July, 1890.    It was after these alleged dis-
closures, and on March 17, 1891, that Burch went to
Muskegon.

The defendant and her mother testify to the matters set
up in the defendant's answer.    The allegations of com-
plainant's original bill are for the most part without sup-
port in the testimony, so far as they attempt to show
improper conduct on defendant's part.    Defendant's testi-
mony was that, when the subpœna was served upon her,
she sought out complainant, and asked what it meant;
that complainant replied that there was so much expense;
asked her what she had done with the $80 which he had
given her; said that he could not and would not stand
the expense; and in the course of conversation he offered
her $1,000 if she would allow him to get the divorce,
saying that he thought that pretty good pay,· and asked
her what she had earned since she came there.    This is
not denied.

Taking into consideration the explicit denials of defend-
ant and Pulford; the testimony of defendant's mother and
that of Mr. and Mrs. Free; the relations and character of
Davidson and Ida M. Watson; the improbabilities of the story
told by Burch, Woodworth, and Lane; the state of the

hotel register at Muskegon; the methods employed by complainant and Burch, acting for him, to procure testimony; and the silence of complainant notwithstanding his implication with Burch,—we can but find that the complainant's charges of adultery are not made out. The methods employed give color to all the testimony offered to prove the charges made, irrespective of any inherent weaknesses or improbabilities in the testimony itself; and the testimony must be weighed in the light and glare of the means resorted to to get it. In the presence of such influences, it is impossible to determine their extent, or to determine what is fabricated and what is not. Nor have parties litigant any right to burden courts with any such duty. The principle of the maxim, *falsus in uno, falsus in omnibus*, may be extended to the entire testimony offered in behalf of a litigant who is shown to have been guilty of corrupt practices in procuring that testimony, or any part of it. A party coming into a court of equity, asking to be released from the bonds of matrimony and its obligations, must come with clean hands, and keep them clean, so far as relates to the procurement of testimony to make out his case.

We think that the allegations of the cross-bill are sustained by the testimony, and that, under the circumstances of this case, the court below was right in permitting defendant to file her amended answer, asking affirmative relief. Defendant is entitled to the relief prayed for.

The decree of the court below is therefore reversed, and a decree entered here for defendant, with costs of both courts to defendant, and a solicitor's fee here of $200. The defendant will be allowed such sum as permanent alimony as may be fixed by the circuit judge after a hearing upon that question, and the record will be remanded for that purpose.

The other Justices concurred.