CLINTON MUDGE HALL, *Appellant*, v. MARY AUSTIN HALL, *Appellee.*

Division A.

Opinion Filed April 4, 1927.

1. A bill of review based upon errors apparent on the face of the record must ordinarily be brought within the period limited by statute for taking an appeal from the decree sought to be reviewed, which in this jurisdiction means within six months.

2. When a bill of review is brought on the ground of newly discovered evidence, it must appear that leave of the Court for the filing of same was obtained; must set out specifically such new matter, showing its materiality—that it would have required a different determination of the cause, that injury had resulted to the complainant in the bill of review, and that such new matter was not discovered until after the rendition of the decree attacked, and could not by the exercise of reasonable diligence have been discovered before the hearing or the rendition of the decree.

3. The bill of review for error apparent on the face of the record cannot be predicated upon mere formal irregularities, nor upon matters resting in discretion. The decree complained of must be contrary to some statutory enactment, or some principle or rule of law or equity recognized and acknowledged or settled by decision; and in order to ascertain if there be error in the decree, the general practice is to look back of the decree into the whole record of the pleadings and proceedings, but excluding the evidence.

4. The bill in this case, not showing any error upon the face of the record, is in its essence an original bill to impeach a divorce decree for fraud in its procurement, and hence is considered as such regardless of the name by which it was designated by the pleader.

5. The mere admission or confession of adultery on the part of a defendant in a divorce proceeding, without any substantive evidence of the *delictum*, is not sufficient or proper evidence to authorize a court to dissolve the marital bond; as such admission, standing alone, smacks of collusion.

6. If at any time before a court's jurisdiction of a divorce case has terminated, fraudulent collusion of the parties is brought to the attention of the court, it becomes the duty of the court to investigate, and if such investigation reveals such collusion, it is within the power, and certainly within the duty of the Chancellor to deny the divorce applied for, or to set aside the decree if one has already been entered. The court has the power to institute such investigation and to take such action upon motion of either of the parties, or *ex mero motu* upon any information convincing the court of the fraudulent or collusive character of the action, before the court has lost jurisdiction and control thereof.

7. But where a collusive divorce decree has become final, and the time within which a motion for a rehearing, or to set aside the decree, or to take an appeal, has expired, different rules apply. Judgments and decrees in divorce proceedings, as in other cases, which have become final, can only be impeached and set aside by due compliance with the established and recognized remedial processes of equity, one of the fundamental principles of which is, that a party who comes into equity, asking relief, must come with clean hands, and that equity will not ordinarily interfere at the instance of either party to set aside a judgment or decree obtained by the fraud or collusion of the parties, in the absence of a clear showing or coercion, imposition, or fraud on the party complaining.

8. It is axiomatic that equity will leave parties to fraudulent transactions where they have placed themselves. The rule is practically universal that a party in a court of equity will not be heard to complain of his own wrong or of another's wrong whereof he was a partaker.

9. Sound public policy requires that the courts should not be trifled with, without severe penalty attaching, and one of those penalties is that a party who has participated in the fraudulent procurement of a judgment or decree cannot be heard to ask of the court which he or she has imposed upon any relief whatever as against the same.

10. Where the parties to a divorce proceeding have procured the decree of divorce as a result of a fraudulent and collusive agreement, they will both be bound by the decree, and neither party participating in the imposition upon the court will be permitted to set aside the decree so obtained, even though the guilt of the party so applying to set aside the decree may be to some degree relatively less than that of the opposite party.

11. Where a party comes into this State and, by misrepresentation as to his or her place of residence, invokes the jurisdiction of a Florida Court and obtains a final decree of divorce, such party cannot afterward be heard to impeach such decree for the lack of jurisdiction thus wrongfully invoked. Although the decree may be a nullity, the law refuses to the guilty parties all relief concerning it.

12. A complainant on whose bill a divorce was rendered, who, after the decree has become final and the court has lost control of the cause, seeks to impeach on bill filed for that purpose such final decree for fraud or collusion in its procurement, will not be rendered the relief prayed where it appears that such complainant was to any appreciable degree a culpable and legally responsible participant in such fraud and collusion, and the attempt to annul such final decree springs from motives of personal advantage; nor is the complainant in such a suit entitled to the allowance of alimony and solicitor's fees *pendente lite*.

An Appeal from the Circuit Court for Palm Beach County; C. E. Chillingworth, Judge.

Reversed.

*Fred M. Valz* and *Austin Miller,* for Appellant.

*Cromwell Gibbons,* for Appellee.

BROWN, J.—This action was instituted in the circuit court for Palm Beach County, Florida, in November, 1923, by Mary Austin Hall,. for the purpose of setting aside a decree of divorce rendered by said court on March 24, 1923, in a suit wherein she was the complainant and the appellant here, Clinton Mudge Hall, was the defendant..

The first pleading filed by Mary Austin Hall, in November, 1923, was a petition to open, review and vacate the divorce decree rendered more than six months previously, and to allow her alimony and solicitor's fees. To this a demurrer was sustained and leave given to file "an original bill in the nature of a bill of review." Complainant then filed an application to be allowed to file an "amended petition or bill of review" upon the ground of newly discovered facts, and which leave was granted. She then filed a "petition or bill of review," which, in order to form a basis for the decree rendered thereon, was evidently treated by the court below as an original bill in the nature of a bill of review, or as an original bill to impeach the former decree for fraud. Reynolds v. F. C. P. Ry. Co., 42 Fla. 387, 28 So. 861; Zewadski v. Barksdale, 86 Fla. 552, 98 So. 590; Shrader v. Shrader, 36 Fla. 502, 18 So. 672; State v. White, 40 Fla. 297, 24 So. 160; Mattair v. Card, 19 Fla. 455; Rawlins v. Rawlins, 18 Fla. 345; Johnson v. Johnson, 182 Ala. 376, 62 So. 706. It will be seen from the above authorities that a bill of review based upon errors apparent on the face of the record must ordinarily be brought within the time limited by statute for taking an appeal from the decree sought to be reviewed, which with us means within six months. Upon such a bill, it is not allowable to look into the evidence to establish it—the error must be apparent

on the face of the record, that is upon the bill, answer and other pleadings and proceedings and the decree. And when brought on the ground of newly discovered evidence, it must appear that leave of the court was obtained; must set out specifically such new matter, showing its materiality; that it would have required a different determination of the cause; that injury had resulted to the complainant in the bill of review; and that such matter was not discovered until after the rendition of the decree attacked, and could not, by the exercise of reasonable diligence, have been discovered before the hearing or the rendition of the decree. Whitehouse Equity Prac. Secs. 143-151. See also 3 Encyc. Pldg. & Prac. 570-586, and Fla. Chancery Jurisprudence, 245, *et seq.*

Error apparent cannot be predicated upon merely formal irregularities, nor of matters resting in discretion. The decree complained of must be contrary to some statutory enactment, or some principle or rule of law or equity recognized and acknowledged or settled by decision. And in order to ascertain if there be error in the decree, the general practice is to look back of the decree into the whole record of the pleadings and proceedings, but excluding the evidence. See authorities above cited.

As there does not appear on the face of the record of the proceedings in the divorce case, or in the decree construed in the light of the pleadings, any error such as would have formed the basis for a bill of review, even if filed in time, we will turn to a consideration of the bill as an original bill (or as an original bill in the nature of a bill of review) to impeach the decree of divorce for fraud in its procurement, which seems to be the real essence of the bill regardless of the name by which it was disignated by the pleader. The bill alleges that both complainant and defendant were and had been for some years residents of the State of New York, and that the decree for divorce in Florida was ob-

tained as a result of a fraudulent conspiracy; that the complainant was a victim of that conspiracy and that her participation in the proceedings was brought about as a result of such conspiracy, and that she signed the bill and other papers presented to her without reading them and without knowing what they were. The evidence adduced on the hearing leads us clearly to the conclusion, as it did the court below, that the jurisdiction of the court was fraudulently invoked, and the decree of divorce fraudulently obtained upon evidence largely fictitious and legally insufficient, in that, as a matter of fact, the complainant in the case, Mrs. Hall, was neither a resident nor a citizen of the State of Florida, as alleged in her bill of divorce, and the evidence to sustain the adultery of the defendant husband charged in the bill was merely testimony to the effect that the defendant had, in the presence of the witnesses, admitted his guilt as charged, with a woman no one else appears to have ever heard of and whom the chancellor was no doubt correct in finding was probably a myth—conjured up by the imagination of Mr. Hall to suit the purpose of the conspiracy to obtain the divorce. That the mere admission or confession of adultery on the part of the defendant, without any substantive evidence whatever of the *delictum,* is not sufficient or proper evidence to authorize a court to dissolve the marital bonds, seems quite well settled. Standing along, such admission smacks of collusion. 2 Nelson on Marriage & Divorce, Sec. 781; 2 Schouler on Marriage, Divorce & Separation, Sec. 1568; 19 C. J. 127. However, the evidence adduced on the hearing does not show, as claimed in the bill, that Mrs. Hall was merely an innocent victim of a conspiracy and had no conscious part in the fraud practiced upon the court, but tends to the conclusion that she was at least to some extent a guilty participant in the fraud and collusion by which the decree was obtained, and the controlling question in this

case is whether or not she was in a position to ask any relief of the court as against such decree.

The essential features of the sordid story revealed by the evidence are as follows: Clinton Mudge Hall, who had been divorced by his former wife and to whom he was, according to his testimony, still paying $300.00 per month alimony at the time of the hearing in this case, was married to the complainant, Mary Austin Hall, in Maryland in 1916. Their home thereafter was in New York. For sometime prior to the divorce proceeding in Florida in March, 1923, these parties had not been getting along together very happily, and it appears that even before coming to Florida, Mrs. Hall had been contemplating going to Paris to get a divorce, and soon after arriving in this state she had promised Mr. Hall to let him "have his freedom." Mrs. Hall had not been well, when in December, 1922, she was invited by Mrs. Huntington to visit her during the winter at her cottage in Palm Beach. She had but recently met Mrs. Huntington, though Mr. Hall had known her some little time, apparently having met her in a business way, Mr. Hall being a stockbroker and Mrs. Huntington having operated in stock somewhat herself. Toward the last of December, 1922, Mr. and Mrs. Hall and Mr. and Mrs. Huntington journeyed to Palm Beach, Florida, being accompanied as far as Jacksonville by a Mr. Waters, a New York cotton broker having a home on Metacumbe Key in Monroe County, Florida. Mr. Waters was a married man, but he and his wife had separated. The party arrived in Palm Beach on Christmas Day, Mr. Waters joining them there a few days later, the latter spending a part of his time on his yacht, which was anchored off Palm Beach. Some six days later Mr. Hall and Mrs. Huntington returned together to New York City on business, and then returned together to Palm Beach about February 1, 1923. Mr. Hall remained there about a week and then returned to New

York on business, Mrs. Huntington following in a few days. Mrs. Huntington returned to Palm Beach about March 7th and Mr. Hall about a week later. During this time Mrs. Hall had remained in the cottage at Palm Beach, but just before her husband's return, she left for the Keys on a yachting trip, about March 14th, together with her niece, a girl about sixteen, as the guests of Mr. Waters, who had with him a gentleman guest, and they were joined at Miami by a nephew of Mr. Waters and his wife. The party was detained in Miami for three days on account of the illness of Mrs. Hall, and then proceeded down to the Keys. During this period preceding the yachting trip, there had not only been some discussion of the matter of divorce between Mr. and Mrs. Hall, but Mrs. Huntington had commenced proceedings to obtain a divorce from her husband, and divorce proceedings were either pending or contemplated as between Mr. and Mrs. Waters. It also seems that during this eventful winter season Mr. Hall and Mrs. Huntington had become infatuated with each other, and about the same time Mr. Waters became deeply interested in Mrs. Hall—to which she at least offered no objections. The evidence affords more than a mere surmise that it was contemplated by Mr. Hall and Mrs. Huntington that if Mr. and Mrs. Hall were divorced, Mr. Hall would marry Mrs. Huntington, and that it was also in the minds of Mr. Waters and Mrs. Hall, at least of Mr. Waters, who admitted it, that if Mr. and Mrs. Waters were divorced, Mr. Waters would marry Mrs. Hall if she would accept him, and he evidently had very few doubts on that score. There was considerable evidence to the effect that Mrs. Hall had consulted an attorney of West Palm Beach with reference to obtaining a divorce in Palm Beach County before her trip to the Keys and gave him the date upon which the bill was drafted, though she denied it. There was convincing evidence, however, to the effect that Mrs. Huntington

had consulted this attorney, who was conducting her own divorce proceedings, with reference to obtaining a divorce for Mrs. Hall also, Mrs. Huntington admitting it but claiming that she did this at the request of Mrs. Hall and that the latter was present at one or more of the interviews. All this Mrs. Hall denied. It appears that on March 21st, Mrs. Huntington learned that the attorney would probably have to leave the city on the night of March 22nd, to be gone some days, and she wired to Mr. Waters that it was necessary for Mrs. Hall to return to Palm Beach by 3:00 P. M. on March 22nd, and also Mr. Waters if possible. Mr. Waters and Mrs. Hall left the Keys on a mid-day train for Miami, from whence they motored to Palm Beach, arrived there about 6:30 on the evening of March 22nd. The matter of the divorce was discussed at length, Mrs. Hall testifying that Mr. Hall and Mrs. Huntington were urging her to consent to immediate action looking to the obtainment of the divorce, and Mr. Hall and Mrs. Huntington testifying that it was entirely agreeable to Mrs. Hall. The testimony of Mr. Waters, who was present part of the time, tended to corroborate that of Mrs. Hall. At any rate, as a result of the discussions some one telephoned the lawyer and at about 8:30 P. M. that night, the lawyer arrived with a bill of complaint prepared for Mrs. Hall's signature, and answer for Mr. Hall's signature, and a waiver of notice consenting to immediate final hearing, also for Mr. Hall's signature. Prior to the arrival of the attorney, Mr. and Mrs. Hall had a private conference, Mrs. Hall claiming that Mr. Hall urged her to go on with the proceedings and promised to pay her $500.00 per month and return to her certain property, and Mr. Hall testifying that he refused to promise anything of that kind. It seems from her testimony that Mrs. Hall was advised by the attorney that if the matter of alimony was included in the proceeding, it would mean consider-

able delay, and rather than delay the proceeding any longer, and in response to repeated urging, she agreed to sign the papers. Mrs. Hall claimed that she did this reluctantly as she did not like the looks of the proceedings, and was troubled by a remark which she claimed Mrs. Huntington had made to her that in getting everything fixed up for this divorce she had done enough to "put her in jail for life." Mrs. Huntington denied all this and claimed that she was acting throughout as a friend of Mrs. Hall and at her instance and request. Mrs. Huntington paid the attorney $500.00 retainer, which she obtained from Mr. Waters, as a loan, so Mr. Waters said, and the attorney left with the papers. The next day, Mrs. Hall, Mrs. Huntington and the attorney appeared before a special master, in the attorney's office, and signed testimony to the effect that Mr. Hall had in their presence admitted the charge made in the bill. Mrs. Hall did not remember signing any papers except those she signed on the night of March 22nd, but her signature to her testimony as shown in the master's report appears to be genuine and the special master testified that he did not sign the report until this testimony had been inspected, signed and sworn to in his presence by the the respective witnesses. Mrs. Huntington admitted her signature to the testimony appearing in the master's report, but also admitted that a part of the testimony, wherein she represented New York City as her home, and wherein she said that she had known Mrs. Hall for several years, was untrue; that as a matter of fact she had only known Mrs. Hall a short time and that Palm Beach was her (Mrs. Huntington's) home and has been for about five years. Both in the bill signed by Mrs. Hall, and in the testimony, she claimed to have been a resident of Palm Beach since about December 1, 1922, and she testified that about the first of March, 1923, she had become convinced from information gained from her husband that he had been

guilty of improper relations with the woman named in
the bill, and that he had finally admitted the charge in an
interview at which Mrs. Huntington and the attorney were
present. In spite of Mrs. Hall's testimony that this matter
was rushed through so rapidly that her signature was
gained to these papers without giving her an opportunity
to learn what she was signing, the reading of all the testi-
mony will leave very little doubt that, although Mrs. Hall
may have been more or less influenced to sign these papers
by the urgency of her husband and Mrs. Huntington, and
her husband's promise to make financial provision for her,
she really desired the divorce and was by no means bliss-
fully ignorant of the contents of the bill and testimony so
signed by her, and that the statement therein made by her
with regard to her residence being in Florida, and which
she admitted was not true, was nevertheless signed by her
with knowledge of its substantial purport and meaning.
All this testimony was rather indefinite as to the time Mr.
Hall made the confession referred to, though indicating that
it was at least a few days previously; whereas the testi-
mony on this hearing indicates that as a matter of fact it
took place the night before the bill was filed. The bill was
filed March 23, 1923; answer of Mr. Hall, neither admit-
ting nor denying the charge made in the bill, was filed the
same day; also the waiver above referred to. The order ap-
pointing the special master appears to have been signed on
the same date, by the circuit judge, and filed in the clerk's
office on the next day, March 24th. The master's report was
filed on the same day that the final decree was signed,
March 24th; also on that date an order was made that the
files be sealed and placed in the vaults of the clerk's office,
not to be delivered to any person except upon the order of
the court. The final decree of divorce was signed March 24,
1923, by the then circuit judge and was filed March 29th.
About that time the attorney was paid $1500.00 more by

Mrs. Huntington for his services in the suit, Mrs. Huntington testifying that it was in traveller's checks secured from Mr. Waters, and Mr. Waters testifying that he paid the attorney for Mrs. Huntington in a check on a certain bank in New York signed by Mrs. Huntington. About a week later Mrs. Huntington procured a divorce from her husband, and Mrs. Hall procured a certified copy of her divorce decree. Shortly thereafter the parties returned North, and Mr. Hall and Mrs. Huntington were married on April 30th, though Mrs. Hall claims that before this marriage took place she had told Mr. Hall that her attorney in New York had advised her that the Florida divorce was not legal. It appears that Mr. Hall, after having been requested by the plaintiff several times to pay her alimony, refused to do so, whereupon she consulted an attorney in New York who informed her that, in his opinion, the Florida divorce was illegal. This suit, to set aside and annul such divorce decree on the ground of fraud, was filed about eight months after it was obtained. The answer of Mr. Hall in this suit amounts to a general denial, with the additional defenses that the complainant is not acting in good faith; that if any fraud had been committed, it was done with her knowledge, consent and participation, and further that the defendant has since the decree was rendered married another woman in good faith.

Appellants contend that Mrs. Hall's motive in bringing this action to set aside the decree was to force him to pay her alimony. It is true that strenuous efforts were made by Mrs. Hall in the instant suit, as shown by her pleadings and motions, to obtain an order or decree by the lower court requiring Mr. Hall to pay her alimony and solicitor's fees, but this was refused by the chancellor on the ground that both complainant and defendant were nonresidents and had been all along. As to Mrs. Hall's motive for bringing this suit, the following quotation from her testi-

mony is pertinent. After testifying Mr. Hall had promised on his word of honor to pay her $500.00 per month, because he wanted to get the divorce; that this opportunity might not occur again, and that if the question of alimony was put in it would delay the matter for months, she consented, but not until she had been assured by the attorney that it was legal; then follows:

"Q. And then you consented?

A. I signed the papers.

Q. You knew it was for the purpose of getting a divorce from your husband, didn't you?

A. It was supposed to be, yes, that is what I had been told.

Q. You agreed to that divorce on the consideration that he would pay you $500 per month alimony?

A. I agreed to that because I promised Mr. Hall three days after our arrival here that I would give him his freedom; he asked me for it.

Q. And you agreed to let him have it?

A. Yes.

Q. And you knew this was a proceeding to let him have it?

A. I knew it was a proceeding to allow me to get a divorce, because he was admitting his unfaithfulness; that was what I was told.

Q. How soon after that was the decree given to you?

A. In about two weeks Mrs. Huntington brought it and handed it to me.

Q. Did you understand when you got there, that a decree had been entered for you against your husband?

A. I thought it was a final decree of divorce, that I had one.

Q. You understood that you were divorced?

A. I thought so, yes.

Q. When did you change your mind about it?

A. When I talked to Mr. Earl in New York and he said it didn't look as though it was legal to him.

Q. What was your object in going there to Mr. Earle?

A. Because Mr. Hall didn't send me the money that he had promised to do, and I wanted to know if there wasn't some way to make him do it.

Q. You asked Mr. Hall to send you the money and he would not do it?

A. He didn't.

Q. And your idea was to make him send you the money?

A. Yes.

Q. What is your purpose in bringing this suit?

A. My purpose in bringing this suit is to set aside this decree which is not legal.

Q. Why do you want it set aside?

A. Because it isn't a legal divorce.

Q. Then you would not object if it was legal?

A. I told him it was perfectly all right if I could get a legal divorce.

Q. Are you perfectly willing to have a divorce from Mr. Hall?

A. Most decidedly.

Q. You don't want to have him as your husband any more, do you?

A. No.

Q. You don't want to be his wife any more?

A. I think I answered that in that other one, certainly not.

Q. You don't intend to be his wife any more, do you?

A. No.

Q. If he had paid you the $500.00 a month there never would have been any question about this divorce?

A. Perhaps if he had kept his promise I never would have known it was not legal.

Q. If he would have paid you the $500.00 a month alimony you would have been satisfied?

A. I probably would not have questioned the divorce at all; I didn't question the divorce at all, but I went to Mr. Earle to tell him that Clinton hadn't given me the money as he had promised, and then he said that it didn't look legal to him.''

It appears from the above that Mrs. Hall would never have questioned the decree if her husband had paid the alimoney agreed on, and that the real motive for bringing this suit was one of personal advantage, that is to compel the defendant to make provision for the complainant's maintenance, rather than from a desire to relieve the Court from the imposition which had been practiced upon it. This conclusion is supported by the further proceedings taken by complainant, as appears from an opinion of the New York Supreme Court, published in the New York Law Journal of August 9, 1924, cited by counsel for both parties, which shows that after the Court below had set aside the divorce decree here involved, the New York Court, in an action therein for absolute divorce by Mrs. Hall against her husband, had under consideration a motion for an order awarding temporary alimony to the complainant. The opinion by Mr. Justice Crane reviews the facts in the case, and recites the fact that the divorce decree in Florida had been set aside by the decree of the Circuit Court for Palm Beach County on June 7, 1924, upon the ground of fraud. In such opinion it was, among other things, said: ''The papers establish that the so-called Florida divorce was a shameless and shameful proceeding, in that this plaintiff was not merely an unsuspecting victim, but in some relatively small degree a guilty participant. There is no rea-

son to suppose that it can be given validity. It is plain that it is to the interest of all the parties that the marriage relation between the plainiff and defendant should be legally severed. Plaintiff will not, however, be allowed to use a situation which could not have been brought about but for what she did in connection with the Florida action, to obtain any money payments beyond what will suffice for her maintenance when living with frugality. She can live quietly and reputably on $30.00 per week, and that sum is awarded to her. Counsel fee is awarded in the sum of $250.00, subject to a motion to increase this amount if the Florida proceedings now pending are further prosecuted and no alimony or counsel fee allowed therein.''

We concur in the conclusion of the Court below that this scheme to obtain as promptly as possible a divorce in Florida between these parties originated in the mind of Mrs. Huntington, but it could not have been put through without the co-operation of both Mr. and Mrs. Hall, and that, while the conduct of Mrs. Hall was, in the light of all the evidence, the least reprehensible of any of the trio, the facts by no means show that she was entirely innocent of any conscious participation therein. Nor does the evidence in the case bear out the contention that Mrs. Hall can be acquitted of fault on the ground of her physical or mental condition; nor does there appear any ground for holding that she acted under duress. It is true Mrs. Hall had not been very well, and was quite ill for three days during the first part of the yachting trip, but does not appear that her mental faculties were in the least impaired. The evidence creates the impression that she was, mentally (and certainly morally) the equal, if not the superior, of any of the participants.

It is also true that the evidence indicates that Mrs. Hall, while participating in imposing upon the Court, was her-

self imposed upon; that she would not have consented to sign the bill, which omitted any claim for alimony, had not her husband first agreed to make suitable provision for her maintenance, which agreement he forgot all about as soon as the decree was rendered. But this agreement.was collusive, and its violation by the defendant gave the complainant no right to ask the Court to annul the decree. Manifestly, the divorce decree attacked by the bill should never have been rendered. The insufficiency of the evidence, the filing of the bill, answer and master's report of the testimony all on the same day, and the character of the pleadings and the evidence, would appear to have been sufficient to have put the Circuit Judge on inquiry as to whether or not collusion was the foundation of the proceedings. If at any time before the Court's jurisdiction had terminated, such collusion had been brought to the attention of the Court either by motion of one of the parties, or by mere suggestion to the Court, it would have become the duty of the Court to investigate, and if such investigation revealed such collusion, as evidence upon the hearing in this case has done, it would have been within the power, and certainly within the duty, of. the Chancellor to set aside the decree. The Court has power to institute such investigation and to take such action *ex mero motu* upon any information convincing him of the collusive character of the action before he has lost jurisdiction thereof. This duty arises from principles of public policy and the interest of the public in divorce proceedings. Lanktree v. Lanktree (Cal.) 183 Pac. 954; Rehfuss v. Rehfuss (Cal.), 145 Pac. 1020. But where a collusive decree has become final, and the time within which a motion for rehearing or to set aside the decree could be made or an appeal taken, has expired, different rules apply. Judgments and decrees which have become final can only be impeached and set aside by due

compliance with the established and recognized remedial process of equity, one of the fundamental principles of which is that a party who comes into equity, asking for relief, must come with clean hands, and that equity will not ordinarily interfere at the instance of either party to set aside a judgment or decree obtained by the fraud or collusion of the parties, in the absence of a clear showing of coercion, imposition, or fraud on the party complaining. Lanktree v. Lanktree, *supra*. It is axiomatic that equity will leave parties to fraudulent transactions where they have placed themselves. In discussing this principle as applied to divorce cases, Bishop, in his work on Marriage and Divorce, Sec. 1548, says: ''This doctrine is an inevitable result from the universal rule of our law that one in a court of justice cannot complain of his own wrong, or of another's wrong whereof he was a partaker. It would be a special novelty for a plaintiff to address the tribunal with, 'The defendant and I have been playing a trick on this Court, but I discover that he has got the better of me, so please turn the tables on him.' '' In the very able opinion of the Court below, rendered in connection with the decree and evidencing a commendable indignation at the fraud which had been imposed upon his predecessor in judicial office, the Chancellor appears to have grounded his action largely upon the public interest in divorce proceedings and his conclusion therefrom, which was that sound public policy required the Court to set aside the decree obtained by perjury and fraud and to ''wash its hands of such judicial farce.'' We fully appreciate the force of this suggestion; but sound public policy also requires that the Courts should not be trifled with without severe penalty attaching, and one of those penalties is that a party who has participated in the fraudulent procurement of a judgment or decree cannot be heard to ask of the Court which he or she has

imposed upon any relief whatever as against the same. That this principle is applicable to divorce decrees is well established by the authorities. In Nelson on Divorce and Separation, Sec. 1055, it is said: ''Where the parties have obtained a decree of divorce by entering into an agreement to suppress evidence, or to not interpose a defense, or by other collusive agreements, they will be bound by the decree, and the wife cannot plead her own collusion as a fraud upon the Court in order to have the decree vacated and additional alimony granted to her.

''Although such decree is a fraud upon the Court, and therefore against public policy, in some cases the decree will not be disturbed, because it would be much more against public policy to relieve parties who are *in pari delicto,* or to allow the wife to profit by her collusion. A decree will not be vacated where the wife agrees to permit the husband to procure a divorce on the ground of her adultery, in consideration that the husband pay her a sum of money and convey to her certain real property, which he refuses to do after obtaining the divorce. If the decree was vacated and the wife allowed to interpose her defense, 'she would occupy a more advantageous position from which to renew her demand for money, and perhaps, profiting by her experience, negotiate for another collusive divorce upon a cash-in-hand basis.' Whether right or wrong, the parties cannot be relieved from a shameless bargain to deceive the Court.

''In some instances the decree will be vacated where the wife is an unwilling party to the collusion, and participated in it under the coercion of the husband because she was weak and helpless. Then the collusion becomes a form of force and fraud. A decree will be vacated where the wife is compelled to sign the petition for divorce against her husband; or where the wife, while in a weak and helpless

condition, is brought into the State, and compelled to accept service of a summons upon the understanding that the decree will be for desertion, and the husband obtains a decree for adultery, and deprives her of her right of dower.

"Collusion of the parties in going to another State to procure a divorce will prevent either of the parties from showing, in a subsequent proceeding, that the decree was void for lack of jurisdiction. Neither of the parties can complain of mutual fraud upon the Court. The party who invoked the aid of the Court cannot be heard to question its jurisdiction. This is a form of estoppel similar to that which prevents a party from attacking the validity of a judgment after he has accepted the benefits of it. The decree, which is void for lack of jurisdiction over the subject-matter, must always remain so, and no act of the parties can invest it with the force and vitality of a decree rendered by a Court of competent jurisdiction. Although it is a nullity, the law refuses all relief concerning it and binds the parties by their collusive agreement."

To like effect see also Schouler on Marriage and Divorce, Vol. 2, Sec. 1754 9 R. C. L. 451, 19 C. J. 168. This doctrine is supported by the great weight of authority. Green v. Green, 2 Gray, 361, 61 Am. Dec. 454; *In re* Ellis' Estate, 55 Minn. 401, 56 N. W. 1056, 43 Am. St. Rep., 514, 23 L. R. A. 287; Kinnier v. Kinnier, 45 N. Y. 535, 6 Am. Rep. 132; Miltmore v. Miltmore, 40 Pa. 151; Johnson v. Johnson, 182 Ala. 376, 62 So. 706; Hubbard v. Hubbard, 19 Colo. 13, 34 Pac. 170; Simmons v. Simmons, 47 Mich. 253, 10 N. W. 360; Carlisle v. Carlisle, 96 Mich. 128, 55 N. W. 673; Nichols v. Nichols, 25 N. J. Eq., 60; Singer v. Singer, 41 Barb. (N. Y.) 139; Whittley v. Whittley, 60 Misc. 201, 111 N. Y. Supp. 1078; Weimer v. Weimer, 21 N. D. 371, 130 N. W. 1015; Newman v. Newman, 27 Oklah. 381, 112 Pac. 1007; Erdman v. Erdman, 43 Okla. 172, 141 Pac. 965;

Karren v. Karren, 25 Utah 87, 69 Pac. 465, 60 L. R. A. 294, 95 Am. St. Rep. 816; Robinson v. Robinson, 77 Wash. 663, 138 Pac. 288, 51 L. R. A. (N. S.) 534; Davis v. Davis, 61 Me. 395; Brigham v. Dillaway (Mass.), 57 N. E. 328; Moor v. Moor (Tex.), 63 S. W. 347; Van Voorhis v. Van Voorhis, 53 N. W. 964; Paffen v. Paffen, 94 N. J. Eq. 356; Beard v. Beard, 65 Cal. 354, 4 Pac. 229; Newcomer v. Newcomer (Iowa), 201 N. W. 579; Scott v. Scott (Va.), 128 S. E. 599; Crane v. Deacon *et al.* (Mo.), 253 S. W. 1068.

The overwhelming weight of authority supports the proposition that a complainant, on whose bill a divorce was rendered, after the Court has lost control of the cause and adjudication has become final, who seeks to impeach, on bill filed for that purpose, such final decree for fraud or collusion in its procurement, will not be granted relief against such former decree where it appears that such complainant was to any appreciable degree a culpable and legally responsible participant in such fraud or collusion, and the attempt to impeach and annul such former decree springs from motives of personal advantage.

The Court below was without error in denying the complainant's motion for allowance of alimony and solicitor's fees pending this proceeding, not only for the reasons stated in the Chancellor's opinion,—the non-residence of both parties,—but also because, as we have above found, the complainant's suit was not legally maintainable, and our statutes authorizing allowances of alimony and suit money do not extend to actions of the nature here involved. The appellee's cross-assignments of error are therefore without merit and the cross-appeal dismissed. 19 C. J. 228.

The final decree of the Circuit Court herein was erroneous, however, as above pointed out, in granting the prayer in appellee's bill to vacate and set aside the former decree,

and in denying appellant's motion for rehearing, and such decree and order must therefore be reversed.

Reversed.

ELLIS, C. J., AND STRUM, J., concur.

WHITFIELD, P. J., AND TERRELL AND BUFORD, J. J., concur in the opinion.