SAUL v. SAUL.

No. 7246.

United States Court of Appeals for the District of Columbia.

Decided July 21, 1941.

Henry I. Quinn, James C. Wilkes, James E. Artis, Frank J. Hogan, and Nelson T. Hartson, all of Washington, D. C., for appellant.

Alvin L. Newmyer and David G. Bress, both of Washington, D. C., for appellee.

Before GRONER, Chief Justice, and EDGERTON and RUTLEDGE, Associate Justices.

RUTLEDGE, Associate Justice.

The plaintiff, appellant here, sued to annul his marriage to defendant, asserting that she was incompetent to enter the marital relation. The basis for the claim is the alleged invalidity of a Tennessee divorce, which she secured three days before the marriage, from Mr. Gardner, a former husband who remains living at the present time. By cross bill Mrs. Saul sought separate maintenance for herself and their adopted infant son and the custody of the child. The decree was in her favor as to annulment, maintenance and custody of the son.

The principal issues relate to the effect which should be given to the Tennessee divorce. Mrs. Saul, then Mrs. Gardner, instituted the suit June 7, 1927, in the Circuit Court of Davidson County. The decree in her favor was rendered July 9, 1927. Under Tennessee law the court had jurisdiction to grant divorce, for the statutory causes, "if the petitioner has resided in this state two years next preceding the filing of the bill or petition."[1] Mrs. Gardner's bill alleged that she was, and had been

---

[1] Tenn.Code Ann.(Michie, 1932) § 8428. The pertinent provisions are: "A divorce may be granted for any of the aforesaid causes, though the acts complained of were committed out of the state, or the petitioner resided out of the state at the time, no matter where the other party resides, if the petitioner has resided in this state two years next preceding the filing of the bill or petition."

for the required period, a citizen and resident of Davidson County, Tennessee, and that Mr. Gardner "probably claims his legal residence in Massachusetts." The court found that he was a nonresident and notice of suit was given by publication pursuant to the statute[2] and an order of court. Mr. Gardner did not appear nor did he, prior to entry of the decree, receive notice of the suit other than that afforded by the publication.

By previous arrangement, Mr. Saul met Mrs. Gardner at Wheeling, West Virginia, a day or two after the decree was rendered, and they proceeded by automobile to Richmond, Indiana, where they were married on July 12, 1927. Thereafter they lived together as husband and wife at various places in the United States and Canada until their separation in 1934.

In addition to the facts charged as ground for annulment, plaintiff alleged that Mrs. Saul deserted him in April, 1934, departing voluntarily from their home in Riverside, Ontario. Since then they have not cohabited. Defendant, however, says that plaintiff forced her to leave, and thus abandoned her and the adopted son. It was not until July, 1934, three months after the separation, that the idea of annulling the marriage first occurred or was suggested to Saul, during a conference with counsel.

The gist of plaintiff's case is that the defendant, then Mrs. Gardner, was not a resident of Tennessee at the time of the divorce; that she was domiciled then in the District of Columbia, as was Mr. Gardner; that the courts of Tennessee were therefore without jurisdiction to grant a valid divorce; and that the decree was obtained by fraud perpetrated on the court.

Most broadly, the argument challenges the jurisdiction of Tennessee and her courts to deal with the Gardners' marital status. Necessarily this implies that the evidence does not support the finding in this cause that Mr. Gardner, and hence also his wife, were domiciled in Tennessee when the divorce was sought and secured.

More narrowly, assuming that jurisdiction of the subject matter existed, plaintiff urges that the decree was wanting in due process for lack of sufficient notice to Mr. Gardner. The statute authorized notice by publication as to nonresidents. Plaintiff says that the findings in this cause, contrary to that of the Tennessee court, establish that Gardner was domiciled in Tennessee, and consequently the published notice did not comply with the statute or due process of law. Plaintiff thus seeks to impale defendant upon one or the other horn of a dilemma, want of jurisdiction of the res or lack of due process in the notice of suit.

Defendant's escape likewise is double-pronged. She says the evidence fully supports the finding as to Mr. Gardner's domicil, hence also as to her own. She urges too that the Tennessee statute providing for published notice to nonresidents applies not only to persons not domiciled in Tennessee, but also to domiciliaries who are merely absent from the state, which she claims was Mr. Gardner's situation. Accordingly, in her view, the court had complete jurisdiction of the res and the notice fully complied with the statute and due process. Defendant also strongly insists that plaintiff is estopped to deny the validity of the divorce by having aided and abetted her to secure it.

The principal issues on the appeal, therefore, may be stated briefly:

(1) Whether the evidence is sufficient to sustain the trial court's findings and conclusions concerning the domicil or domicils of Mr. and Mrs. Gardner in 1927 and the preceding years;

(2) If so, whether the published notice complied with the statute and with due process of law; and

(3) Whether plaintiff should be permitted to challenge the validity of the divorce.

I. We think the evidence is sufficient to sustain the finding that the Gardners' domicil was in Tennessee at the time of the divorce.

The evidence is extensive, detailed and in many respects conflicting. But without minute review it clearly shows that Mr. Gardner's domicil of origin in Massachu-

---

[2] Tenn.Code Ann.(Michie, 1932) § 10431, in part as follows: "Personal service of process on the defendant in the court of chancery, is dispensed with in the following cases: (1) When the defendant is a nonresident of this state. * * * (2) When, upon inquiry at his usual place of abode, he cannot be found, so as to be served with process, and there is just ground to believe that he has gone beyond the limits of the state. * * * (3) When the sheriff shall make return upon any leading process, that he is not to be found [here follow other instances where process is dispensed with]."

setts continued from his birth in 1890 to 1912, when he came to Washington, and that it probably continued until 1917, when he went to Nashville, Tennessee, to live and work. Mrs. Gardner's domicil of origin was in Tennessee from her birth until her marriage to Mr. Gardner in 1917.

We think too that the evidence clearly sustains the court's finding that Gardner acquired a new domicil in Tennessee in 1917. He was physically present there. His work was there. It seemed permanent, except for possible interruption by military service. He formed happy social attachments there. He became engaged to a Tennessee girl. Both desired and intended to make Tennessee their home. After his marriage, when he was inducted into service, he intended to return to Nashville to live and work. He did return there when he was discharged. From 1912, when he left Massachusetts, to 1917, Gardner's life had been a roving one. He moved about frequently from place to place over a wide area in the central and southern states as his work, construction engineering, required. His business headquarters and address for the certain receipt of mail were in Washington, but he spent little time here, had no permanent physical or social connections with the community, and had no permanent home in any true sense of the word. Neither his connections with Massachusetts nor those with Washington were such as to sustain the presumption of continuance of domicil in the face of the evidence of intention to change it and the acts bearing this out in 1917.

It is clear too that the Tennessee domicil continued until 1919, when Gardner was discharged from military service and returned to Nashville, where his wife had remained and worked during his absence. The crucial question, we think, is whether the evidence sustains the finding that the Tennessee domicil continued from 1919 to 1927, during which time the Gardners resided and worked in Washington. Plaintiff urges most insistently that by coming back to Washington, working and living here from 1919 to 1927, both Gardner and his wife acquired a domicil here which con-

tinued until the divorce was sought and granted. A finding to that effect might have been sustained, but the evidence is conflicting and the contrary one must stand. It is supported both by legitimate inferences from their mode of living and by direct testimony concerning their absence of intention to make Washington their permanent home.

There is nothing to prove that they intended to make it such when they came here in 1919. He came to see his brother about working again for the engineering firm which the latter headed. Unexpectedly a governmental position opened up, and Gardner accepted it, though it afforded little, if any, more than subsistence.

From that time until the divorce the Gardners lived and worked in Washington. But they lived more like transients than as permanent residents.[3] They subsisted, but they hardly established a home. Their life was not that of persons permanently attached to the place. Nothing in the way they lived and were forced to live gives clear, much less incontrovertible, evidence of animus manendi. On the contrary, their mode of life supports the inference that they were sojourners, awaiting an opportunity to return to their home community, as the trial court found.

The finding is supported also by the testimony of Mr. Gardner and Mrs. Saul concerning their intentions to return to Tennessee when they came to Washington and during their sojourn here. The court relied particularly upon the testimony of Gardner, which was given "in a straightforward and convincing manner and without evasion."

As against these facts, plaintiff offers no incontrovertible evidence of the Gardners' intention to make Washington their permanent home when they came or afterward. He relies chiefly upon the length of their residence here and statements made by Gardner at various times, in civil service applications and other documents, that Washington was his "residence," "legal residence," "bona fide legal residence," "voting legal residence," etc. There was other evidence to show the Gardners' inten-

---

[3] Finances were close. They cut the cloth to the pattern. They lived at first in single rooms, moving frequently, a sort of suitcase life. Later they occupied small apartments, hardly more than a single room. They bought no furniture, except once when it was necessary to take over what the vacating tenant left in order to secure the apartment, and this was very little. They had no children, Mr. Gardner testifying that he "was not enthusiastic," an attitude hardly surprising in view of the mode of life dictated by financial necessity.

tion to reside here indefinitely or until employment in Tennessee might be afforded. But its effect, at most, was to create conflict with the evidence offered by defendant. That might have sustained a finding of the court in plaintiff's favor, but it is not sufficient to require that the contrary one be overthrown. It may be added that the court specifically accepted Gardner's explanation concerning his apparently inconsistent statements in the civil service applications.[4] The court correctly concluded that the Tennessee court had jurisdiction to adjudicate and dissolve the marital status of the Gardners.

▆▆▆ II. The question regarding the sufficiency of the published notice of suit is more difficult. The findings in this case establish that Mr. Gardner, as well as his wife, was domiciled in Tennessee in 1927. Yet the Tennessee court found that he was a nonresident of that state and on this finding ordered that notice be given him by publication. Plaintiff urges that the findings of the two courts are contradictory, and that the notice therefore cannot have been effective, since the finding in this cause is now controlling. He says that the defendant perpetrated fraud upon the court by alleging that Mr. Gardner *"probably* claims his legal residence in Massachusetts." (Italics supplied.) Consequently, it is urged, the notice was ineffective, either to confer personal jurisdiction over the defendant Gardner or to give him notice of the suit sufficient to comply with due process.

We think the charge of fraud is not sustained by the record, at any rate so far as Mrs. Saul is concerned. She testified, without contradiction, that the allegation was placed in the bill through her attorney's misunderstanding of information which she had given him. She had told the lawyer that Mr. Gardner was born in Massachusetts, but that both of them were residents of Tennessee. When she signed and veri-

fied the bill, she thought the attorney "had gotten it just a little bit wrong." The allegation, moreover, was cautious, not positive. These facts hardly establish a case of deliberate and intentional fraud. Furthermore, if the contrary were true, the fraud would rest primarily upon the plaintiff's shoulders rather than his wife's, since, as will appear, he prevented her from correcting the attorney's error. Finally, there is nothing in the findings or conclusions of the trial court which sustains the charge of fraud. On the contrary, all of their implications are to the opposite effect. That is true, though their conclusion concerning Gardner's domicil may be at variance with that of the Tennessee court. It follows that the order for the notice, and therefore the notice itself, may have been made and given erroneously, but neither was vitiated by fraud. Something more than mere error must be shown, in attack upon a foreign judgment, to deprive it of force and effectiveness.[5]

▆▆▆ Putting aside the question of fraud, plaintiff argues that the error was jurisdictional in the fundamental sense that the court acquired no power to proceed with or determine the cause.[6] The contention appears to take two forms. First, it is said, that if Gardner was in fact a resident of (i. e., domiciled in) Tennessee, contrary to the allegations of the bill for divorce and the adjudication of the decree, "then, as such resident, he was never brought within the jurisdiction of the Tennessee Court in that action." If by this is meant that it was necessary for the Tennessee court to acquire personal jurisdiction of the defendant in the suit for divorce, the argument is obviously fallacious. The suit was not in personam. It was in rem or quasi in rem. If the court had jurisdiction of the marital status, jurisdiction of the defendant's person was not required.[7]

▆▆▆ But a defendant in divorce is entitled to notice which comports with due

[4] This was that he then "did not know anything about legal residence," and put down these answers because they indicated the place where he was then living and could be reached by mail or other form of communication. The court found that "a casual reading of Mr. Gardner's answers to the questions clearly indicates that he did not understand their meaning and purpose."

[5] Chicago, Rock Island & P. R. Co. v. Sturm, 1899, 174 U.S. 710, 19 S.Ct. 797, 43 L.Ed. 1144; Dunstan v. Higgins, 1893, 138 N.Y. 70, 33 N.E. 729, 20 L.R.A. 668, 34 Am.St.Rep. 431; Sullivan v. Douglas Gibbons, Inc., 1939, 187 Ga. 764, 2 S.E. 2d 89.

[6] Cf. National Benefit Life Ins. Co. v. Shaw-Walker Co., 1940, 71 App.D.C. 276, 283, 284, 111 F.2d 497, 505, and authorities cited therein.

[7] Haddock v. Haddock, 1906, 201 U.S. 562, 569, 26 S.Ct. 525, 50 L.Ed. 867, 5 Ann.Cas. 1; cf. Pennoyer v. Neff, 1878, 95 U.S. 714, 24 L.Ed. 565.

process, though what this is may vary to some extent with circumstances.[8] Taking the argument therefore as meaning that the court's error prevented it from acquiring power to make its decree effective as to Gardner because of failure to give him notice sufficient to comply with due process, we think it assumes two things. The first is that the Tennessee statute applies only to persons not domiciled in Tennessee, and excludes her domiciliaries residing or sojourning elsewhere; or, if the latter be included, that notice by publication to a domiciled defendant situated as was Gardner, though complying with the statute, does not comport with due process. The second assumption is that an error made, without fraud, upon the record before the court as to the domicil of the defendant, in ascertaining the form of notice to be given him, is jurisdictional in the fundamental sense which permits collateral attack upon the decree.

It is at least doubtful whether either assumption can be maintained. It may be that the word "nonresident," in statutes authorizing notice by publication, frequently, if not perhaps generally, applies exclusively to persons not domiciled in the state.[9] But this is not always true. It may include domiciliaries sojourning or residing elsewhere. The Tennessee statute appears to be open to this construction. No decision of that state's courts excluding it has

been cited. No other section of the statute seems to include the case of one situated as was Gardner, a domiciliary residing elsewhere.[10] It is perhaps even less clear that, if the statute should be so construed, the notice published pursuant to it would be wanting in due process.[11]

The second assumption likewise cannot be regarded as established law. In the absence of fraud, an erroneous finding concerning the domicil of the defendant in a divorce proceeding, for purposes of prescribing the form of notice to be given, would not appear so wide a departure from accepted conceptions of due process as to vitiate the notice and the judgment resting upon it. The basic test is the reasonableness of the notice under the circumstances. If published notice without more would be sufficient in the case of one not domiciled in the state, which plaintiff does not question, it is difficult to see why it should not be so also in the case of a domiciliary residing elsewhere and having no place of abode within the state. The two situations are technically different for jurisdictional purposes when the question is as to the plaintiff's domicil for purposes of suing for divorce, but they are hardly substantially different for purposes of giving notice to the defendant which meets the requirement of reasonableness implicit in due process.[12]

But we do not find it necessary to decide

---

[8] Bryant v. Shute's Ex'r, 1912, 147 Ky. 268, 144 S.W. 28; Central Pennsylvania Conference Educational Soc. v. Larue, 1912, 164 Mo.App. 93, 148 S.W. 152; cf. McDonald v. Mabee, 1917, 243 U.S. 90, 37 S.Ct. 343, 61 L.Ed. 608, L.R. A.1917F, 458; Milliken v. Meyer, 311 U. S. 457, 61 S.Ct. 339, 85 L.Ed. 278; (1940), (1941) 41 Col.L.Rev. 724.

[9] Goodrich, Conflict of Laws, 2d Ed. 1938, 147; Beale, Residence and Domicil (1918) 4 Iowa L.Bull. 1.

[10] The statute is quoted, so far as is material, in note 2 supra. Appellant appears to urge that the notice should have been based on the second subdivision of the statute. But this subdivision clearly contemplates a defendant who has a "usual place of abode" within the state, where process may be left. It does not appear to cover a domiciliary who is residing outside the state and maintains no place of abode within it for the time being. Unless the first subsection includes such a person, therefore, his case appears to be an omitted one.

[11] McDonald v. Mabee, 1917, 243 U.S. 90, 37 S.Ct. 343, 61 L.Ed. 608, L.R.A. 1917F, 458, holding that published notice

to a domiciliary, who was also a nonresident, was insufficient, involved a judgment which purported to bind the defendant personally, as well as to foreclose a lien. The court held the personal judgment void, carefully limiting the decision to the case of a defendant technically retaining domicil, but having left the state not intending to return. The decision did not affect the foreclosure of the lien, and specifically recognized that a different rule might apply in cases for divorce, citing Haddock v. Haddock, 1905, 201 U.S. 562, 26 S.Ct. 525, 50 L.Ed. 867, 5 Ann.Cas. 1. Decisions involving the nonresident motorist acts relate to personal judgments, not to those resulting from proceedings in rem or quasi in rem. See (1941) 41 Col.L.Rev. 724 and authorities cited therein.

[12] In McDonald v. Mabee, 1917, 243 U. S. 90, 37 S.Ct. 343, 344, 61 L.Ed. 608, L.R.A.1917F, 458, Holmes, J., recognized the similarity of the two situations for purposes of determining the sufficiency of the notice, saying: "There is no dispute that service by publication does not warrant a personal judgment against a nonresident. Pennoyer v. Neff, 95

these questions, whether in regard to construction of the Tennessee statute, its validity as construed, or the effect of the Tennessee court's error upon the question of Mr. Gardner's domicil. This is for the reason that we think the plaintiff is in no position to raise them.

III. If estoppel or other considerations of an equitable character can preclude one from questioning the validity of a judgment or decree on jurisdictional grounds or for want of due process in the notice of suit, such principles should be given effect in the present case. Because the Tennessee court had jurisdiction of the subject matter, i.e., the Gardners' marital status, it is not necessary to determine whether considerations of this character would prevent the plaintiff from challenging the decree if jurisdiction in that respect had been lacking.[13] But the Tennessee court had jurisdiction of the res, and the only question therefore is whether equitable principles should be applied to prevent the plaintiff from questioning in this suit the sufficiency of the notice given to Mr. Gardner in the divorce proceeding. We think they should be so applied.

■■ Total lack of power in a court to deal with the subject matter presented to it in a particular suit goes not merely to protection of the parties in securing a fair hearing, but to the authority of the court itself. For this reason some cases take the view that considerations of estoppel, unclean hands, and unconscionable conduct ordinarily applicable in equity can have no application to prevent one from challenging the court's power in this fundamental sense.[14] On the other hand, the opposite

view is strongly supported, by some courts on grounds of estoppel,[15] by others on general considerations of an equitable character.[16]

The reasons supporting the view first stated have no application when the challenge to the jurisdiction is made on the ground that the notice given to the defendant was lacking in due process. Such an attack does not reach down to the fundamental authority of the court to deal with the subject matter of the suit. It affects rather the personal protections which it is required to give to the defendant, such as affording him a reasonable opportunity to appear and be heard. That is a matter which primarily, if not perhaps exclusively, concerns him, rather than strangers to the suit.

■ The plaintiff, Saul, was not technically a party to the Tennessee suit. But he certainly was interested in its outcome. His interest then was to procure the result which he now seeks to nullify. He, as much as any other not excepting Mrs. Gardner, was responsible for institution of the suit and obtaining the decree. He not only knew that she proposed to bring the suit. He actively aided her to do so. There is even reason to believe that without his instigation she might not have brought it. A merely partial statement of his part in the matter will show with what ill grace he now seeks to undo what his own hand wrought.

The Gardners lived together as husband and wife until 1923 or 1924, when estrangement occurred. Thereafter for economic reasons they occupied the same quarters, but marital relations ceased and they

U.S. 714, 24 L.Ed. 565. * * * Some language of Pennoyer v. Neff would justify the extension of the same principle to absent parties, but we shall go no farther than the precise facts of this case require." If the situations may be regarded as substantially identical in regard to sufficiency of notice in personal actions, they would seem to be so also as to proceedings in rem, though the character of the notice required might differ.

13 Cf. Goodloe v. Hawk, 1940, 72 App. D.C. 287, 113 F.2d 753, and the decisions of this court therein cited and discussed.

14 Smith v. Foto, 1938, 285 Mich. 361, 280 N.W. 790, 120 A.L.R. 801; Fischer v. Fischer, 1930, 254 N.Y. 463, 173 N.E. 680; Kiessenbeck v. Kiessenbeck, 1933, 145 Or. 82, 26 P.2d 58. See, also, Sim-

mons v. Simmons, 1927, 57 App.D.C. 216, 19 F.2d 690, 54 A.L.R. 75, and Frey v. Frey, 1932, 61 App.D.C. 232, 59 F.2d 1046, discussed in note 17 infra.

15 Goodloe v. Hawk, 1940, 72 App.D. C. 287, 113 F.2d 753, discussed infra note 17; Fairclough v. St. Amand, 1927, 217 Ala. 19, 114 So. 472; Van Slyke v. Van Slyke, 1915, 186 Mich. 324, 152 N.W. 921; Margulies v. Margulies, 1931, 109 N.J.Eq. 391, 157 A. 676; Kaufman v. Kaufman, 1917, 177 App.Div. 162, 163 N. Y.S. 566.

16 Hall v. Hall, 1910, 139 App.Div. 120, 123 N.Y.S. 1056; Cromarty v. Cromarty, 1917, 38 Ont.L.Rep. 481, 33 D.L.R. 151; Deyette v. Deyette, 1918, 92 Vt. 305, 104 A. 232, 4 A.L.R. 1115; Notes (1937) 109 A.L.R. 1018, (1939) 120 A.L.R. 815, (1939) 122 A.L.R. 1321.

agreed to, and did, otherwise go their separate ways. Gardner continued to pay the rent and other apartment expenses, but otherwise Mrs. Gardner supported herself or procured support from other sources. They continued in this mode of living until the divorce.

In these circumstances, Saul met Mrs. Gardner in September or October, 1924. Thereafter they saw each other with increasing frequency until their association ripened into an understanding for marriage. Saul was fully conversant with the Gardners' relations and arrangements. Though he denied it, she testified he supplied her liberally with funds which she used for support, pleasure, recreation, and trips to Tennessee and Philadelphia. They sought to overcome the obstacle of her marriage to Gardner. Saul wished to have it annulled. He financed her trip to Tennessee to consult her attorney concerning this. Counsel advised annulment was impossible but that a divorce could be secured. When she reported to Saul he urged that she proceed at once to procure the divorce. She did so, Saul advancing the necessary funds. Though he denied financing the divorce, the evidence clearly was sufficient to sustain a finding that he did so. When she received the complaint for signature and verification she noticed the error the attorney had made in the allegation concerning Gardner's residence. She wished to correct it and consulted Saul about doing so. He advised her, "Don't bother. It isn't important. Pay no attention to it." He took her at once to his father's place of business, from which he called a notary public, before whom he had her sign and verify the bill. It was returned at once to the Nashville attorney, and filed. When the case was ready for hearing Saul accompanied Mrs. Gardner on her way to Nashville, driving her in his own car as far as Roanoke, Virginia. From there she proceeded alone. The hearing was held at once and, as has been stated, she met Saul at Wheeling, West Virginia, the day after the decree was entered, and they were married two days later in Indiana.

Plaintiff now claims that defendant was the moving, luring party throughout. But the evidence, much of which has not been referred to, is conclusive that in everything Mrs. Gardner did toward procuring the divorce Saul was at her side urging her on. If what she did had amounted to fraud on the court, he more than she was party to it. She at least desired to correct the attorney's error. In his anxiety for her freedom, he prevented her from doing so. Assuming that he did this from ignorance rather than intent to defraud, it is true nevertheless that in this crucial respect he, rather than Mrs. Gardner, was author of the court's error, if error there was, and he was also recipient of its fruit. That the sweet may have turned sour does not make it conscionable that he should be allowed now to undo what his own hand and mind had so much to do with creating. We hold, therefore, that the plaintiff has put it beyond his power to question, with legal effect, the sufficiency or validity of the notice which was given to Mr. Gardner in the divorce proceeding. This result is all the more appropriate in view of the fact that the latter has not questioned the notice or the divorce. On the contrary, he has relied upon it, by entering another marriage since the decree was rendered. We have not found it necessary to extend the application of the principles of estoppel or equitable disqualification beyond the sufficiency of the notice given to Mr. Gardner. But if it had been necessary to apply them more broadly, so as to preclude challenge by the plaintiff to the court's jurisdiction of the res, the circumstances of this case would present a situation peculiarly appropriate for such an application, within the authorities which have been cited as sustaining this result.[17] The court properly determined the issue of annulment in favor of the defendant.

Apart from the matter of annulment, lit-

[17] Cf. notes 15 and 16 supra. In Goodloe v. Hawk, 1940, 72 App.D.C. 287, 290, 113 F.2d 753, 756, we held that a husband who caused his wife to procure a foreign divorce in order to marry her and lived with her for ten years before instituting suit for annulment "should be barred by the salutary principles of laches or estoppel" from challenging the foreign court's finding concerning the wife's domicil. Simmons v. Simmons, 1927, 57 App. D.C. 216, 19 F.2d 690, 54 A.L.R. 75, and Frey v. Frey, 1932, 61 App.D.C. 232, 59 F.2d 1046, were distinguished as involving foreign divorces procured by fraud and the broad doctrine of those cases was limited in the light of Curry v. Curry, 1935, 65 App.D.C. 47, 79 F.2d 172, and other later decisions of this court.

tle question has been raised concerning the relief which was given to defendant pursuant to the prayer of her cross bill. The evidence clearly was sufficient to sustain the court's finding that plaintiff had deserted the defendant by refusing to cohabit with her, that she was entitled to support for herself and their adopted son in the amount specified, and that she should have the custody of the child under the terms of the decree.

The decree is affirmed.