OBERSTEIN *v.* OBERSTEIN.

4-9137                                    228 S. W. 2d 615

Opinion delivered April 10, 1950.

*William Weisman, Cooper Land* and *Rose, Dobyns, Meek & House,* for appellant.

*Richard M. Ryan, Howard F. Corcoran* and *Owens, Ehrman & McHaney,* for appellee.

ED. F. McFADDIN, Justice. The facts in this case present a sordid story, involving not only the litigants, but also two attorneys, W. R. Berkson of New York City, and Morris Hecht of Hot Springs, Arkansas.

Mr. and Mrs. Oberstein lived in a Fifth Avenue apartment in New York. They had been married for many years, and had a daughter, Patricia, 17 years of age, when, in January, 1947, Mr. Oberstein announced to his wife that he wanted a divorce. He had become infatuated with another woman. When Mrs. Oberstein refused to consider a divorce, Mr. Oberstein moved from the apartment, ceased paying a $150 weekly allowance to his wife, and used the daughter, Patricia, to convey his threats to the effect that if Mrs. Oberstein did not obtain a divorce, he would give her no money.

At first Mrs. Oberstein consulted a New York attorney of her own chosing and was well advised that she could force Mr. Oberstein to contribute to her support. But she discontinued the services of her attorney and went to W. R. Berkson, her husband's attorney,[1] and made a "trade" with that attorney and her husband that she would obtain a divorce, in return for a contract of financial support. On July 22, 1947, Berkson gave Mrs. Oberstein a memorandum:

"Bus leaves 42nd Street Air Terminal Wednesday, July 23, 1947, 7 A. M. our time, for Newark. Plane leaves Newark 6:50 A. M. Eastern Standard Time (7:50 A. M. daylight saving time), flight 207 American Airlines. Arrives Little Rock, Arkansas 12:40 noon.

"Upon arrival in Little Rock, you are to make arrangements at the field for a flight to Hot Springs, and are to telephone Mr. Morris Hecht, the attorney, whose offices are in the Arkansas Trust Building, Hot Springs, Arkansas, and whose telephone number is HOT SPRINGS 2657. He will make all arrangements for you there, and will call for you on your arrival at Hot Springs.

"You are to return on Thursday, July 24th, leaving from Little Rock, Arkansas at 5:30 P. M., flight 210 American Airlines. You are to make arrangements to arrive in Little Rock before 5:00 P. M. Mr. Hecht undoubtedly will assist you in making such arrangements.

W. R. B.''

At the same time he gave Mrs. Oberstein this memorandum, Berkson delivered to her the air line tickets and two of his own personal checks payable to Morris Hecht, one for $75 and the other for $90. Also Berkson gave Mrs. Oberstein a letter to Hecht which introduced Mrs. Oberstein, discussed her grounds for divorce, and told Hecht what Berkson desired the decree to contain. There was this significant sentence:

---

[1] In Mr. Oberstein's response to the motion to vacate, he refers to Berkson as his attorney in this sentence: "He alleges that the plaintiff asked his attorney to assist her in engaging a Hot Springs attorney who would represent her in the contemplated proceeding."

"I feel confident that you will handle this matter to the satisfaction of all parties concerned."[2]

[2] The full text of the letter is:

"July 21, 1947

Re: Mary M. Oberstein
    v. Eli E. Oberstein
Morris Hecht, Esq.
Arkansas Trust Building
Hot Springs, Arkansas

Dear Mr. Hecht:

"Mrs. Oberstein will leave New York on Wednesday morning, 6:50 o'clock, flight No. 207, and is expected to arrive in Little Rock at 12:40 noon. She will call you from Little Rock and will endeavor to fly from Little Rock to Hot Springs.

"For your information, the facts are as follows:

"The parties were married on April 14, 1930, in Easton, Pennsylvania. There is one child of the marriage, to wit: a daughter, Patricia Louise Oberstein, who was born on January 31, 1931.

"Mrs. Oberstein's action for divorce is based upon indignities to the person which consist of foul and abusive language by the defendant, so repeated and continuous in the presence of friends, strangers and business associates as to constitute a course of conduct rendering plaintiff's condition intolerable. His attitude toward plaintiff indicated conduct connoting settled hate and manifestation of alienation and estrangement. He would boast to plaintiff and to others in their presence of his affairs with other women, would embrace other women in plaintiff's presence, would on innumerable occasions state that he had not occupied the same bed with plaintiff for several years because he derived greater satisfaction from his affairs with other women.

"During the past number of years he would absent himself from home for long periods of time, and for the past three years abstained from having any marital relations with plaintiff, and in fact occupied a bed separate and apart from plaintiff. More recently defendant packed his belongings and took up quarters away from the home, and has not returned, and in addition, has stated that he refuses to return to the plaintiff, and for a long period of time had refused to furnish her with moneys for her subsistence and that of the daughter of the marriage.

"I believe the above sets forth sufficient indignities to the person of the plaintiff, and shows a desertion and abandonment.

"The plaintiff and defendant will agree upon terms of support and maintenance after the action is instituted, and will consent to the inclusion of such terms in the decree to be entered in the case. I believe that I can prepare the waiver here in New York and can obtain the signature of the defendant. Shall I include in such waiver the terms of alimony and support agreed upon between the parties, or do you require that by stipulation in the action to be included in the decree. I prefer that no separation agreement be entered into at this time.

"Mrs. Oberstein will make payment directly of your fees and expenses for her lodgings.

"I feel confident that you will handle this matter to the satisfaction of all parties concerned. If you require coöperation from me, you have but to call upon me.

"Mr. LaCrosse joins me in best wishes and kindest regards.

               "Yours very truly,

WRB/sm
Air Mail"

In keeping with the Berkson memorandum, Mrs. Oberstein flew to Little Rock on July 23, 1947, and proceeded to Hot Springs, where she contacted Morris Hecht. He took her to the Arlington Hotel, and she gave him the Berkson letter and the two checks. He returned to her room in an hour and she signed a paper which now appears as a deposition. Hecht advised her that the divorce decree would be granted on October 28, 1947. She had dinner with Mr. and Mrs. Hecht, spent the night at the Arlington Hotel, and returned to New York by plane the next day. That was the sole extent of her stay in Arkansas and her only visit to this State until some time in 1949, subsequently to be mentioned.

When Mrs. Oberstein returned to New York, she reported her Arkansas trip to Mr. Oberstein, remained in New York a short time, and at Oberstein's expense took a cruise to California via the Panama Canal. When she returned to New York, she went to Berkson's office with her sister so that the latter might furnish a deposition to be used in the pending Arkansas divorce case. Oberstein executed a waiver of service and an entry of appearance, in which appears this language:

". . . And the defendant, Eli E. Oberstein, further agrees to pay to the plaintiff, Mary M. Oberstein, as and for her. support, and the support and maintenance of the infant issue of the marriage, Patricia Louise Oberstein, as follows: $150 per week until such time as the plaintiff shall remarry or die, whichever shall occur the sooner. . . ."

The instrument was acknowledged in New York City by "William R. Berkson" as notary public.

Morris Hecht, the Hot Springs attorney, signed his name to a complaint, filed September 24, 1947, in the Garland Chancery Court, alleging Mrs. Oberstein to be a resident of Arkansas, seeking a divorce from Mr. Oberstein on the ground of indignities, and praying for support and maintenance of $150 per week. At the time he did this, Hecht, of course, knew that Mrs. Oberstein was not a resident of Arkansas. Also, Hecht obtained and filed in the divorce suit the purported deposition of Anna

Cook, 194 Ramble Street, Hot Springs, Arkansas, to the effect that Mrs. Oberstein had lived in the home of Anna Cook continuously from July 23, 1947, to October 22, 1947. Hecht's wife, Kathryn Hecht, as notary public, certified that Mrs. Oberstein appeared before said notary in Hot Springs, Arkansas, on October 22, 1947, and gave her deposition; whereas in fact Mrs. Oberstein had been in Hot Springs only the one time in July, 1947, when there was no suit pending. Morris Hecht also obtained a decree of divorce, on the ground of indignities, for Mrs. Oberstein against Mr. Oberstein on October 28, 1947, in the Garland Chancery Court on what Morris Hecht knew was false evidence of residence.

On October 25, 1947, Mr. and Mrs. Oberstein signed, in New York City, a property settlement agreement, which provided that *if* the divorce decree should be granted, then Mr. Oberstein, in addition to the $150 weekly support money, would pay Mrs. Oberstein $25,000 in cash, pay rent on the apartment, surrender all the furniture in it, and also give Mrs. Oberstein an automobile.[3]

[3] Material portions of this agreement are:

"In the Garland Chancery Court

Mary M. Oberstein
v.
Eli E. Oberstein

STIPULATION

"It is hereby stipulated by and between the plaintiff and defendant in the above entitled action as follows:

"In the event that plaintiff shall obtain a final decree of divorce in the above pending action ,

"(1) The defendant shall pay to the plaintiff the sum of twenty-five thousand ($25,000) in cash.

"(2) The defendant shall renew the lease on apartment 8C at 1150 Fifth Avenue, Borough of Manhattan, City of New York, in his name and shall pay the rent therefor.

.    .    .    .    .

"(4) The defendant shall execute a bill of sale to a certain DeSoto Coupe automobile 1946 model, Serial No. 5793077, Engine No. 51120502.

"(5) The defendant waives all claim for household furniture now in the premises in apartment 8C at 1150 Fifth Avenue, Borough of Manhattan, City of New York.

.    .    .    .    .

"(7) The defendant shall procure a life insurance policy upon his life in the sum of $15,000, shall cause the plaintiff to be named therein as beneficiary, irrevocable, until such time as she shall remarry or die, whichever shall occur the earlier, and the defendant shall make payment of all premiums which may become due on such policy during such period of time.

.    .    .    .    .    .

Both parties acknowledged the instrument before William R. Berkson, notary public. On November 5, 1947, Mrs. Oberstein signed a receipt to Berkson reading as follows:

"Received from William R. Berkson the respective sums of $25,000 and $850, the former representing the cash payment of Eli E. Oberstein to me on securing the final decree of divorce; the latter household allowances and arrears owed me by Eli E. Oberstein. This acknowledges receipt of all other papers referred to in the stipulation in the suit for divorce. . . ."

Oberstein married "the other woman" a few days after October 28, 1947. Mrs. Oberstein continued to receive the $150 weekly payments; but in May, 1948, she filed proceedings in New York to have the Arkansas divorce declared void. Then, on December 20, 1948, she filed, in the original divorce suit in the Garland Chancery Court, a petition to have that Court vacate the divorce decree of October 28, 1947. As grounds for vacating the divorce decree, she alleged that it was void for want of jurisdiction of the Court over the parties, and she sought to excuse herself from her part of the fraud and collusion by the claim that she was under "duress" of her husband when she came to Arkansas in July, 1947; and she claimed that this duress was continuous until November 6, 1947. Mr. Oberstein resisted the motion to vacate. Mrs. Oberstein testified when the motion to vacate was heard by the Garland Chancery Court; and on September 6, 1949, a decree was rendered vacating the divorce decree of October 28, 1947. Mr. Oberstein has appealed.

"The foregoing provisions are in addition to the provisions set forth in the waiver and entry of appearance of the defendant, heretofore executed by him on the 3rd day of September, 1947, and filed in the above entitled action. The provisions hereof, it is stipulated and agreed, are not to be incorporated in any decree to be rendered in this action, but in the event of the breach of any of the provisions herein set forth, the plaintiff shall have the right, independently of these proceedings, to institute any action or proceeding in any jurisdiction whatsoever for the enforcement of the provisions hereof.

"In the event that a final decree of divorce shall not issue or be obtained in the within entitled action, then all the provisions set forth in this stipulation shall be deemed null and void and of no effect whatsoever."

It is only fair to say that none of the present attorneys came into this case until shortly before the filing of the motion to vacate on December 20, 1948; and they as well as the Chancellor are in no wise involved or implicated in the collusion and fraud of the parties, or the unethical conduct of William R. Berkson and Morris Hecht.

So much for the recitation of facts. Now for the applicable rules of law and our holdings:

I. *The Divorce Decree is Void.* It is crystal clear that the divorce decree rendered in this case by the Garland Chancery Court on October 28, 1947, lacked the essential requirement of *jurisdiction.* In *Cassen* v. *Cassen,* 211 Ark. 582, 201 S. W. 2d 585, in speaking of the absolute requirement of "jurisdiction in divorce cases," we said:

"Before a person can become a resident of this State so as to have his marital status determined by the courts of this State, he must, in truth and in fact, be a *bona fide* resident of the State, . . . A divorce decree in this State, to fulfill all the requirements for full faith and credit under the United States Constitution, can determine status only when there is a *bona fide* residence in this State. We quote from § 111 of the American Law Institute's Restatement of the Law on Conflict of Laws: 'A state cannot exercise through its courts jurisdiction to dissolve a marriage when neither spouse is domiciled within the state.' "

In the case at bar neither spouse was ever domiciled in this State, so it is clear that the divorce decree rendered by the Garland Chancery Court in this cause on October 28, 1947, was a decree rendered without jurisdiction, and was and is void, and is not entitled to full faith and credit under Article IV, § 1 of the United States Constitution. What we should do about vacating the decree is yet to be considered.

II. *Duress.* The next question is Mrs. Oberstein's claim that she was under the duress of her husband in coming to Arkansas and obtaining the divorce. She

offers this to excuse her conduct. The elements of duress, sufficient to invalidate a contract, are: (a) coercion; (b) loss of volition; and (c) the resultant contract (17 C. J. S. 526).[4]

To sustain her claim of duress it was incumbent on Mrs. Oberstein to prove that she was compelled—not merely persuaded—to do what she did. The only threat which she says that she received from Mr. Oberstein was, that if she did not agree to get a divorce, he would leave America and pay her no money. These are her words:

"He had told me all along he wouldn't give me any money at all, unless I did what he told me to do."

But even when he made these threats, Mrs. Oberstein knew that he could not cut her off penniless. She had already been so advised by an attorney of her own choosing:

"Q. Did you receive knowledge from any source, through counsel or otherwise, that, under the law, a woman's husband could be made to support his wife and daughter?

A. I didn't need counsel for that. I knew that myself.

Q. Well, you knew that, didn't you?

A. Yes, I did."

Since she knew that Mr. Oberstein's threats were idle, it necessarily follows that she was not coerced by them. The evidence shows that even though she was at first unwilling to divorce Mr. Oberstein, she did agree to it because she thought she was making a good "trade"; and she even required him to pay her expenses for the cruise through the Panama Canal.

Furthermore, all the duress, claimed to have been exerted on her, ceased when she signed the property receipt to Berkson on November 5, 1947. Yet she continued to receive the weekly support money from Mr. Oberstein

---

[4] See, also, Univ. of Ark. Law School Bulletin, Vol. 9, p. 80 (May 15, 1941), "Duress—A State of Mind."

until some time in May, 1948, when she refused the checks because of her New York proceedings. In *Page* v. *Woodson*, 211 Ark. 289, 200 S. W. 2d 768, the wife claimed duress to excuse her from her conduct. The facts showed in that case, just as here, (a) that the claimed duress ceased, with the granting of the divorce and the making of property settlement; and (b) that the wife delayed over three months thereafter before initiating the proceedings which contained the claim of duress. In denying any relief to the wife, we quoted from 17 Am. Jur. 902:

" '. . . A contract entered into under duress may be ratified after the duress is removed. Such ratification results if the party entering into the contract under duress accepts the benefits growing out of it or remains silent or acquiesces in the contract for any considerable length of time after opportunity is afforded to avoid it or have it annulled . . .' "

In the case at bar Mrs. Oberstein's receipt of the weekly payments from November 6, 1947, to May, 1948, and her further delay until December 20, 1948, before filing the motion to vacate the Arkansas divorce decree —these facts together with others in the record—convince us that her Arkansas divorce proceedings were not caused by any duress exerted on her; but that she willingly traded her husband an Arkansas divorce decree for a property settlement. We conclude that she was not under duress and that she is now seeking the cancellation of the Arkansas decree to gain additional leverage on Mr. Oberstein for a "new negotiation."

III. *The Problem Confronting This Court.* With the question of duress decided adversely to Mrs. Oberstein, the case before us becomes one in which a man and his wife conspired and colluded to obtain a divorce decree in Arkansas in a Court that had no jurisdiction. Our Statute (§ 34-1209, Ark. Stats. 1947) provides that no divorce decree will be granted when the parties have been guilty of collusion. Such also is the rule in other jurisdictions. See 17 Am. Jur. 243, *et seq.*; 27 C. J. S. 620, *et seq.*; Keezer's "Marriage and Divorce," 3rd Ed., § 515,

*et seq.*; and see Annotations in 2 A. L. R. 699 and 109 A. L. R. 832. In 17 Am. Jur. 381 these statements appear:

"Collusion between the parties to a divorce proceeding will bar the granting of a decree of divorce, and ordinarily when the fact appears at the trial, the court of its own motion will dismiss the action . . . According to the weight of authority when the spouses through collusion or consent prevail upon the court to take jurisdiction of a divorce suit and render a decree therein, both are precluded from having that decree set aside or attacking its validity because of such collusion or consent, . . ."

From the facts previously detailed, it is clear that both of the parties are culpable in this case. We do not want any Court of any sister State, or of the Federal system, to afford full faith and credit to the void divorce decree rendered in the Oberstein case by the Garland Chancery Court. Neither do we want either of these parties to profit to the slightest extent by reason of their trifling with the Arkansas Courts. Such is the problem confronting this Court.

If Mrs. Oberstein be given the relief she asks—*i. e.*, vacation of the divorce decree—we would, by precedent, make it possible for the Courts of Arkansas to be used by an unscrupulous litigant as a tool for carrying out a peculiarly vicious type of blackmail. Mrs. Oberstein wants the Arkansas divorce decree vacated so she can "re-negotiate" with Mr. Oberstein in her New York suit, in which he would then be unable to claim the Arkansas divorce decree to be entitled to full faith and credit.

On the other hand, if this Court, on its appellate review *de novo* of the case, should reverse the vacating order entered by the Garland Chancery Court in 1949, we would be granting Mr. Oberstein relief to which his own participation in the collusion and fraud disentitles him. He, in effect, is saying that the Arkansas Court was without jurisdiction to grant the divorce in the first instance, but that we should suffer the void decree to remain of record, so he can use it as a shield against Mrs. Oberstein's New York suit. Thus, if we affirm the Chan-

cery Court, we would be allowing Mrs. Oberstein relief to which she is not entitled because of her fraud; and if we reverse the Chancellor's decree, we would be allowing Mr. Oberstein to have relief to which he is not entitled because of his fraud. Each of them is estopped, because of collusion and fraud, from obtaining the sought relief.

In none of our cases have both spouses come 'from another State, and by joint collusion and fraud, obtained a divorce decree from our Court; and then one of the spouses had the temerity. to subsequently ask the Court— in the same case—to relieve the petitioning party against her (or his) own fraud. That is the situation here. So we list the following cases as distinguishable from the case at bar: *Corney* v. *Corney,* 79 Ark. 289, 95 S. W. 135, 116 Am. St. Rep. 80; *Barnett* v. *Miller,* 131 Ark. 110, 198 S. W. 873; *Dawson* v. *Mays,* 159 Ark. 331, 252 S. W. 33, 30 A. L. R. 1463; *Morgan* v. *Morgan,* 171 Ark. 173, 283 S. W. 979; *Rice* v. *Moore,* 194 Ark. 585, 109 S. W. 2d 148; *Murphy* v. *Murphy,* 200 Ark. 458, 140 S. W. 2d 416; *Barth* v. *Barth,* 204 Ark. 151, 161 S. W. 2d 393; and *Feldstein* v. *Feldstein,* 208 Ark. 928, 188 S. W. 2d 295.

Excellent and exhaustive briefs have been submitted by the learned counsel for each side. Mr. Oberstein's counsel cite, *inter alia, Hall* v. *Hall,* 93 Fla. 709, 112 So. 622; *Curry* v. *Curry,* 65 App. D. C. 47, 79 Fed. 2d 172; *McNeir* v. *McNeir,* 178 Va. 285, 16 S. E. 2d 632; *Ferry* v. *Ferry,* 9 Wash. 239, 37 Pac. 431; *Norris* v. *Norris,* 200 Minn. 246, 273 N. W. 708; *Horowitz* v. *Horowitz,* 58 R. I. 396, 192 Atl. 796; *Newcomer* v. *Newcomer,* 199 Ia. 290, 201 N. W. 579; and *Carpenter* v. *Carpenter,* 146 Neb. 140, 18 N. W. 2d 737.

Mrs. Oberstein's counsel cite, *inter alia, Hollings-head* v. *Hollingshead,* 91 N. J. Eq. 261, 110 Atl. 19; *Hopkins* v. *Hopkins,* 174 Miss. 643, 165 So. 414; *Lippincott* v. *Lippincott,* 141 Neb. 186, 3 N. W. 2d 207, 140 A. L. R. 901; *Wampler* v. *Wampler,* 25 Wash. 2d 258, 170 Pac. 2d 316; *Querze* v. *Querze,* 290 N. Y. 13, 47 N. E. 2d 423; and *Roberts* v. *Roberts,* 81 Cal. App. 2d 871, 185 Pac. 2d 381.

In addition to the above cases, we list the following: *Williams* v. *North Carolina,* 325 U. S. 226, 89 L. Ed. 1577,

65 S. Ct. 1092, 157 A. L. R. 1366; *Sherer* v. *Sherer*, 334 U. S. 343, 92 L. Ed. 1429, 68 S. Ct. 1087, 1 A. L. R. 2d 1355; *Coe* v. *Coe*, 334 U. S. 378, 92 L. Ed. 1451, 68 S. Ct. 1094, 1 A. L. R. 2d 1376; *People* v. *Dawell*, 25 Mich. 247, 12 Am. Rep. 260; *In re Ellis Estate*, 55 Minn. 401, 56 N. W. 1056, 23 L. R. A. 287, 43 Am. St. Rep. 514; *Saul* v. *Saul*, 74 App. D. C. 287, 122 Fed. 2d 64; and *Axtell* v. *Axtell*, 183 Ga. 195, 187 S. E. 877.

To review all the cases in which courts have been called on to vacate divorce decrees obtained by fraud or collusion would be a work of supererogation; rather, we give only the general rules from the great weight of authority in such cases[5] and then draw our own conclusions.

In the topic on divorce and separation in 17 Am. Jur. 390, there is a discussion on the vacating and setting aside of void divorce decrees; and we find these three statements of the general rules:

(1)—"Generally speaking, a decree of divorce can be vacated or set aside only at the suit of the spouse claiming to be injured by the decree, where it appears that the granting of the decree was in no way due to his or her fault . . ." 17 Am. Jur. 390.

(2)—"Generally, no relief will be granted in favor of a spouse against whom a divorce decree is granted if he or she consented to the granting of the decree or colluded in its procurement . . ." 17 Am. Jur. 390.

(3)—"According to the weight of authority, when the spouses, through collusion or consent, prevail upon the Court to take jurisdiction of a divorce suit and render a decree, both are precluded from having that decree set

[5] See, also, Leflar on "Conflict of Laws," §§ 133, 137, 138 and 140; the article "The Validity of Void Divorces" by Fowler Vincent Harper in 79 U. of Pa. Law Review 158; the article on "Extraterritorial Divorce" by Lorenzen in Vol. 54, Yale Law Review, 799; and the Annotations in 2 A. L. R. 699, 109 A. L. R. 832, 109 A. L. R. 1018. And in the 1948 Supplement to the Restatement of the Law on "Conflict of Laws," § 112, there is this statement:

"Any person may be precluded from questioning the validity of a divorce decree if, under all the circumstances, his conduct has led to the obtaining of the divorce decree or for any other reason has been such as to make it inequitable to permit him to deny the validity of the divorce decree."

aside or attacking its validity because of such collusion or consent . . ." 17 Am. Jur. 381.

Under the first quoted statement, Mrs. Oberstein is not entitled to have the divorce decree vacated because *she* was at fault in her collusion and fraud in obtaining the decree. Under the second quoted statement, Mr. Oberstein is not entitled to any relief—either in the trial court or here on *de novo* appeal—because *he* was a party to the fraud in obtaining the divorce decree. And under the third quoted statement, both Mr. and Mrs. Oberstein are precluded from any relief of any kind connected with the divorce decree because they were *both* guilty of collusion and fraud on the Court.

But the State of Arkansas is the silent third party to every divorce proceeding in this State; and the other States of the Federal Union are entitled to know whether the divorce decree is valid and entitled to full faith and credit.

Therefore:

(1)—We hold that the divorce decree rendered in this cause by the Garland Chancery Court on October 28, 1947, was and is void; and this adjudication of invalidity prevents the divorce decree from being entitled to full faith and credit in this, or any other State.

(2)—We hold that each of the parties—Mr. and Mrs. Oberstein—is precluded from any relief of any kind involving the said decree: she from having it vacated, and he from having it recognized.

(3)—We refuse to adjudge costs in favor of either party, since both are culpable; and, without reversing or affirming, we direct that a mandate issue remanding this cause to the Garland Chancery Court so that the holding here will be entered as the decree of that Court.

(4)—The proper authorities of Garland County, Arkansas, will investigate and act on the matter of perjury and subornation of perjury as may be developed. We are calling to the attention of the New York Courts the conduct of W. R. Berkson in this case. By *per curiam*

order this day made, the Bar Rules Committee of this Court is directed to institute disbarment proceedings against Morris Hecht.

The Chief Justice concurs and dissents; Mr. Justice GEORGE ROSE SMITH not participating.

GRIFFIN SMITH, Chief Justice, concurring and dissenting. I would admit the Chancery Court's right to judicially fumigate its records. Judge GARRATT was the innocent agency through which a contemptible fraud was perpetrated, but he is in no sense at fault. The original record upon which action was taken justified the decree. Trouble was that it was a fabrication of misrepresentation, presented to the Court by one whom we had licensed to practice law.

The majority opinion, though replete with directions, neither affirms nor reverses. Why sentence the Chancellor to inaction when his conscientious aim was to cleanse the docket and treat the transaction as though the decree had not been rendered? We say there is no jurisdiction because relief in respect of affirmative action must be denied Mrs. Oberstein; yet we recognize jurisdiction in saying what must be done. Our jurisdiction comes through appeal, yet we say the lower Court was judicially nebulous. The Chancellor might at least be permitted to show what he did, and it is of no great importance whether, after becoming informed, he acted on his own motion or at the request of a litigant.

We have assumed jurisdiction for the purpose of saying that the decree was fraudulently procured, but that the iniquity shocks our consciences to such an extent that we are relegated to long-distance observations and advice.

I am not certain that Mrs. Oberstein's information regarding the requirements for continuous residence in Arkansas during the incubation period was such that she should be denied action on the petition for avoidance. There *was* an element of coercion. This polygamously-inclined husband concocted the entire scheme and

94

matured it through his lawyer. The threat was that if Mrs. Oberstein did not comply, her material resources would be cut off.