Carroll *v.* Carroll.

5-2277                                        342 S. W. 2d 79

Opinion delivered January 16, 1961.

*C. Van Hayes* and *J. B. Milham,* for appellant.

*Ben M. McCray,* for appellee.

Carleton Harris, Chief Justice. This is an appeal from a decree of the Saline County Chancery Court, wherein the court found that appellant, Benjamin Carroll, by reason of threats, intimidation, and duress, caused appellee, Peeda Carroll, to procure a divorce decree on June 19, 1950, against her wishes, and without her consent, the court cancelling, setting aside, and holding for naught, the June 19th decree.

The parties were married in South Carolina on July 3, 1942, and at the time of the decree in June, 1950, were residents of the state of New York. On June 21, 1948, after appellee had consulted an attorney friend of New York City, Martha Duff, the parties entered into an agreement in the nature of a property settlement, in which, *inter alia,* appellee acknowledged receipt of $5,000. The agreement further provided:

"6. That, while both parties hereto shall remain alive, and so long as the Second Party remains unmar-

ried, in the event that the parties hereto are divorced by a valid decree of divorce, the First Party shall pay to the Second Party the sum of Nine Thousand Three Hundred ($9,300.00) Dollars, in monthly equal installments on the first day of each and every month beginning with August 1st, 1948, said installments to be in the sum of Eighty-five ($85.00) Dollars, however, in the event of the Second Party's remarriage, this sum shall be no less than One Thousand ($1,000.00) Dollars.''

Two years later (June 3, 1950), the complaint for divorce was instituted in the name of appellee in the Saline County Chancery Court, appellant waiving service of summons, and entering his appearance. The decree was granted on June 19th[1] on the deposition of appellee and Larry Drews, a witness on her behalf. From the evidence of these two persons, the court found that appellant willfully, and without cause, deserted appellee on August 1, 1948, and ''had absented himself from her since that time.'' On June 5, 1952, the decree was amended to incorporate the provisions of the property settlement entered into by the parties in 1948.[2] On October 9, 1958, appellee filed the petition to vacate the decree of divorce, alleging that appellant, through threats and duress, had induced her to consent to being made the plaintiff in the divorce action. Following a hearing, in which both parties testified orally before the court, the decree was entered from which this appeal is taken.

Appellant, in seeking to uphold the divorce decree, asserts several alleged errors by the Chancellor, but, under the view that we take, a discussion of these alleged errors is unnecessary.

According to appellee, the parties, off and on, continued to live together in the same apartment. Mrs. Carroll stated that he would leave for a few weeks, and

---

[1] The Arkansas attorney who filed this complaint and obtained this decree apparently subsequently left the state.

[2] On April 17, 1954, Mrs. Carroll wrote her New York attorney asking that this agreement be incorporated in the decree. Since the decree had already been so amended, it is not clear why the letter was written, unless it be that the parties did not know that the attorney had already taken such action.

go to a hotel or to the home of his mother, but would come back after a period of time. Likewise, she would be gone for a few weeks, but would return to the apartment. She stated that this relationship continued until sometime in 1956, and they did not live in the apartment together after that time. Dr. Carroll testified that, following the divorce, since his wife would not move out of the apartment, he moved, and remained away for the balance of the year 1950, and "for many years thereafter." He did state that he used the apartment as an office when his wife was not present.

It is apparent to this Court that the parties colluded together, practiced fraud upon the Saline Chancery Court, and through such collusion and fraud obtained the divorce decree of June, 1950. We proceed to a discussion of the evidence that reflects the attitude, actions, and intent of each of the parties.

Mrs. Carroll contends that she acted under duress in consenting to the divorce action. Though she stated that Dr. Carroll did not mistreat her physically, appellee testified that he would criticize and ridicule her; would say "nice" things one day, and then ignore her and treat her as a stranger for three or four days. The witness stated that her husband told her to "get out" in 1948, which occasioned the property settlement. However, both parties admitted living together until after the divorce decree was obtained some two years later. Mrs. Carroll testified that she went to attorney **Duff** in 1948 of her own accord, and subsequently, Dr. Carroll went to the attorney's office with her. Appellee stated that Mrs. Duff was acting for both parties. She also testified that it was understood at the time of the agreement that the monthly payments were not to be made unless the divorce was granted. Appellee stated, that pursuant to this agreement, the divorce was granted in Arkansas in 1950. Mrs. Carroll testified that she **did** not come to Arkansas, denied that she signed the deposition (stating that it was a forgery), and denied knowing anyone by the name of Larry Drews (the witness in her behalf). *Admittedly,* however, Mrs. Duff mailed to

the parties two copies of the divorce decree, in which there is a definite finding that Dr. Carroll had deserted Mrs. Carroll on August 1, 1948, and had been away from her since that time. *Admittedly,* appellee directed a letter to her New York attorney, several years subsequent to the decree, in which she asked the attorney to "complete the matter of the court decree regarding the financial arrangement." *Admittedly,* Mrs. Carroll accepted benefits under the provisions of the decree, not only during the period in which, according to her testimony, the parties were still living together, but also for about eight months after the parties were living separate and apart. In fact, from her evidence, Mrs. Carroll did not institute her action to set aside the divorce decree until over two years after she had last lived with Dr. Carroll, and approximately eighteen months after he had ceased making the payments. The record reflects that he paid to her something over $1,300 after they ceased living together.[3]

We are accordingly unimpressed with the assertion by appellee that she acted "under duress". For that matter, irrespective of whether she voluntarily instituted the original divorce action (or instituted it at all), Mrs. Carroll was cognizant of the fact that fraud had been practiced upon the court, for she had the divorce decree in her possession, and was certainly aware that it had been rendered on false grounds and false testimony (even if she was not familiar with the residence requirements in Arkansas). We have concluded that the Chancellor's finding that Mrs. Carroll acted under duress was against the weight of the evidence. No citation, of course, is required to the effect that we try Chancery cases *de novo,* since this has been established by a long line of decisions.

Dr. Carroll testified that he took no part in obtaining the divorce, other than signing the waiver and entry of appearance; that he did not know whether his wife

---

[3] Dr. Carroll testified that he had paid Mrs. Carroll somewhere between $15,000 and $20,000 since the divorce. Mrs. Carroll testified that he had paid about $6,000 during that period. Neither party married again.

came to Arkansas; he denied any collusion, and the rendering of any aid in practicing fraud upon the court. The record disputes this testimony. In the first place, the entry of appearance, admittedly signed by appellant, states: "My name is Benjamin Carroll, and I am the husband of Peeda Carroll; I have read a copy of the complaint filed herein and fully understand the contents thereof." The complaint charged that Dr. Carroll had deserted his wife on August 1, 1948, and had "absented himself from her since that time." Dr. Carroll admitted that he was living with his wife until the divorce decree in 1950. The record also reveals a letter in which Dr. Carroll stated that he had made an initial payment to Mrs. Duff on the divorce proceedings. Of course, he, like his wife, had a copy of the fraudulent decree throughout the years.

We think the evidence reflects that these parties conspired and colluded to obtain a divorce decree in Arkansas in a court that had no jurisdiction, and we are of the opinion that this case is controlled by *Oberstein* v. *Oberstein,* 217 Ark. 80, 228 S. W. 2d 615. The circumstances there were quite similar to the circumstances in the present litigation. Mrs. Oberstein received payments under the decree from November, 1947, until May, 1948, and did not file a motion to vacate the decree until December 20th of the latter year. This Court said:

"In the case at bar Mrs. Oberstein's receipt of the weekly payments from November 6, 1947, to May, 1948, and her further delay until December 20, 1948, before filing the motion to vacate the Arkansas divorce decree— these facts together with others in the record—convince us that her Arkansas divorce proceedings were not caused by any duress exerted on her; but that she willingly traded her husband an Arkansas divorce decree for a property settlement."

The quoted reasoning is equally applicable here. In the present case, of course, Mrs. Carroll received payments for a much longer period, and delayed the institution of her action to set aside the decree for a considerably longer time.

In the *Oberstein* case, this Court likewise found that the husband had conspired and colluded to obtain the Arkansas divorce. From the Opinion:

"From the facts previously detailed, it is clear that both of the parties are culpable in this case. We do not want any Court of any sister State, or of the Federal system, to afford full faith and credit to the void divorce decree rendered in the Oberstein case by the Garland Chancery Court. Neither do we want either of these parties to profit to the slightest extent by reason of their trifling with the Arkansas Courts. Such is the problem confronting this Court. * * *

Thus, if we affirm the Chancery Court, we would be allowing Mrs. Oberstein relief to which she is not entitled because of her fraud; and if we reverse the Chancellor's decree, we would be allowing Mr. Oberstein to have relief to which he is not entitled because of his fraud. Each of them is estopped, because of collusion and fraud, from obtaining the sought relief."

This reasoning expresses completely our views in the instant cause, and in accordance therewith, we render the same holding that was rendered in the *Oberstein* case; in fact, we use the identical language, except for the substitution of names and the proper court.

"(1)—We hold that the divorce decree rendered in this cause by the Saline Chancery Court on June 19, 1950, was and is void; and this adjudication of invalidity prevents the divorce decree from being entitled to full faith and credit in this, or any other State.

(2)—We hold that each of the parties—Dr. and Mrs. Carroll—is precluded from any relief of any kind involving the said decree: she from having it vacated, and he from having it recognized.

(3)—We refuse to adjudge costs in favor of either party, since both are culpable; and, without reversing or affirming, we direct that a mandate issue remanding this cause to the Saline Chancery Court so that the holding here will be entered as the decree of that Court."

It is so ordered.

ROBINSON, J., dissents.

ROBINSON, J., dissenting. Of course, the parties in this case knew nothing about the law regarding residence requirements and jurisdiction of courts. It is perfectly obvious that if a fraud was perpetrated on the court it was the act of the lawyers and not of the litigants. For this reason I would not leave these people in the predicament in which the decision of the majority puts them. Undoubtedly Mrs. Peeda Carroll is estopped from questioning the validity of the decree because of the large benefits she has accepted under the decree, and I would dispose of the case in that manner. Therefore I dissent.